Syllabus.

WEBSTER M. SAMUELS *et al.*

*v.*

JOSEPH B. OLIVER *et al.*

*Filed at Ottawa October 31, 1889.*

1. CONTRACTS—*principal and agent—illegal contract—as, to make a "corner" on the market.* If a grain broker, in executing the instructions of his principal, is required to pay out money to adjust differences in respect of the purchase and sale of grain, and is guilty of no fraud or violation of law, he will be entitled to be reimbursed by his principal for the outlay. The principal is bound to indemnify his agent or broker for losses incurred in executing his orders.

2. But if one employs a broker to purchase and sell grain, with the illegal purpose of "cornering" the market or controlling the price thereof, and this fact is known to the agent or broker, the latter can not recover of his principal for services or money advanced in the execution of such illegal purpose, nor can the employer recover of his agent for moneys received by him in such illegal dealings upon the market.

3. When parties enter into a contract which is illegal or contrary to public policy, the courts will not assist either of them, but will leave them in the position in which their illegal acts have placed them. The party advancing money or performing services under such a contract can not recover for the same of his employer, nor will he be liable to his employer for any profits derived by him in the business of his agency.

4. The enhancement of the price of an article of prime necessity, such as wheat, or other articles, for purposes of extortion, is against public policy. And a combination or agreement to make a "corner" on stock or grain by buying it up, so as to control the market, and then purchasing for future delivery, is illegal, and a party thereto whose funds have been used by his direction in carrying out the agreement can not recover the same back.

5. CUSTOM—USAGE—*as controlling dealings between parties.* A person dealing at a particular market will be taken to have dealt according to the known general custom and usage of that market, and if he employs another to act for him in buying or selling at such market, he will be held as intending that the business shall be conducted according to such general usage and custom,—and this has been held the rule whether he in fact knows of the custom or not.

| | |
|---|---|
| 130 | 73 |
| 40a | 122 |
| 40a | 530 |
| 130 | 73 |
| 149 | 359 |
| 130 | 73 |
| 160 | 114 |
| 130 | 73 |
| 157 | 319 |
| 157 | 570 |
| 130 | 73 |
| 64a | 400 |
| 130 | 73 |
| 67a | 511 |
| 68a | 573 |
| 130 | 73 |
| 168 | 92 |
| 130 | 73 |
| 169 | 183 |
| 130 | 73 |
| 74a | 112 |
| 130 | 73 |
| d92a | ²535 |
| 130 | 73 |
| 99a | ⁵318 |
| 99a | ¹319 |

Appeal from the Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. Joseph E. Gary, Judge, presiding.

This was an action of assumpsit, brought by appellees, to recover a balance of $1368.92 alleged to be due them from appellants, and also for damages for the failure of appellants to deliver 80,000 bushels of wheat, which they had bought, as brokers, for appellees. The declaration contains two special counts and the common counts. The first special count is based on the neglect of the defendants to require sufficient margins to be put up by sellers to them of wheat bought by the defendants for plaintiffs, and a consequent loss to the plaintiffs; the second alleging that defendants became liable to plaintiffs as principals and sellers of wheat on the contracts of purchase made by them for the plaintiffs, by reason of defendants "ringing out" the contracts prior to their maturity. Appellants pleaded the general issue and a plea of set-off, and filed an account with the latter plea, as follows:

*J. B. Oliver & Co., in account with E. M. Samuels & Sons:*

| | | |
|---|---|---|
| 1882—To cash paid in settling losses incurred in the purchase of 80,000 bushels of wheat - | | $2375.00 |
| To commissions on purchase - - - - | | 100.00 |
| | | $2475.00 |
| Cr.   By cash received for your account as profits on part of said $80,000 bushels of wheat for June delivery | $923.75 | |
| By balance in your favor as per bill rendered - - - - - - - - | 1368.92 | |
| | | $2292.67 |
| Balance - - - - - - - - - - | | $182.33 |

A trial was had by the court by consent, resulting in a finding and judgment for the plaintiffs for $2192.67. The Superior Court refused to find damages against the defendants for the default of sellers to them, or on purchases made by them for

the plaintiffs, but rendered judgment in favor of plaintiffs for the ledger account of $1368.92 and the item of $923.75, moneys collected by defendants for plaintiffs on the wheat deal referred to, less the commission of $100. Defendants below appealed to the Appellate Court for the First District, where the judgment was affirmed, and they prosecute this appeal from that judgment.

Mr. M. W. ROBINSON, and Messrs. OVERALL & JUDSON, for the appellants :

Public policy will not permit appellees to maintain this action. Whenever a particular staple is essential to the health and comfort of the community, a combination to absorb, for purposes of extortion, is invalid. 1 Wharton on Contracts, 442 ; *Coal Co.* v. *Coal Co.* 68 Pa. 173 ; *Acton* v. *Pittston and Elmira Co.* 68 N. Y. 558 ; *Raymond* v. *Leavitt,* 46 Mich. 447 ; *Craft* v. *McConoughy,* 79 Ill. 346.

Appellees, as principals, are bound to indemnify appellants for losses incurred in executing their orders. Wharton on Agency, sec. 340 ; Story on Agency, sec. 339 ; *Bailey* v. *Bensley,* 87 Ill. 556.

Persons sending goods to or dealing in a market are supposed to know the usage there prevailing, and to act upon it. Lawson on Usages, 47, 284-287.

Messrs. BISBEE, AHRENS & DECKER, for the appellees :

The ledger balance is admitted, and was not connected with the June deal. The contracts of purchasers were made long before the acts complained of as "cornering" the market, on June 30.

Appellants were liable for the moneys collected, to the persons for whose use the same was paid. *James* v. *Joselyn,* 65 Me. 138 ; *Cappell* v. *Hall,* 7 Wall. 542 ; *Cotton* v. *McKenzie,* 57 Miss. 418 ; *Black* v. *McMurry,* 56 id. 217 ; *Decil* v. *Leventhal,* 57 id. 331 ; *Auding* v. *Levy,* id. 51 ; *Arnot* v. *Coal Co.*

68 N. Y. 558 ; *People* v. *Fisher*, 14 Wend. 9 ; *Sampson* v. *Shaw*, 101 Mass. 145 ; *Salt Co.* v. *Guthrie*, 85 Ohio, 666.

Per Curiam : In the spring and summer of 1882, appellees undertook to run what is known as a "corner" in No. 2 red winter wheat, in the St. Louis market, and for that purpose, and to aid them in bringing about that result, employed appellants and eight or nine other brokers of the city of St. Louis, and through these agencies secured contracts for the sale of large quantities of wheat, to be delivered on or before the last day of June, 1882, and aggregating about 1,100,000 bushels. At the same time, through these same agencies, appellees bought up and secured substantially all of that grade of wheat actually in the market. By this means appellees were enabled to compel those whose contracts they held and had thus secured, for the delivery of wheat on or before the day named, to pay in settlement whatever price appellees might be able to fix as the market price, or might demand.

Shortly prior to June 27, 1882, appellants, as the brokers of appellees, had sold for June delivery, No. 2 red winter wheat as follows : To D. R. Francis & Co., 10,000 bushels, at $1.24¼ per bushel; to E. A. Kent & Co., 5000 bushels, at $1.25, and another 5000 bushels for $1.26 ; and to the Culver Commission Company, 5000 bushels, at $1.28. On the 27th of June, J. B. Oliver, one of appellees, for the purpose of showing an advance in the price of such wheat, and of inflating the market, instructed appellants to purchase for his firm 50,000 bushels, at $1.35 per bushel. At the same time he instructed his other brokers, holding contracts of purchase, to sell to appellants 50,000 bushels of wheat at that price, thus, in effect, buying and selling to himself, and thereby fixing an apparent market price for such commodity, he then having the market therefor under his control. In obedience to such instructions, appellants purchased of D. R. Francis & Co., brokers selling for appellees, 10,000 bushels, at $1.35, but as Francis & Co. held

appellants' contracts of sale for and on account of appellees, for a like amount, at $1.24¼, the latter, under the rules and usages of the Merchants' Exchange, were compelled to pay to Francis & Co. the difference in the price, amounting to $1075. Appellants also, under instructions from appellees, bought 10,000 bushels of such wheat of E. A. Kent & Co., at $1.35, which last firm held the two prior contracts of appellants, so that in "ringing out," as it is called, or settling and adjusting the differences in price, they were obliged, under the rules of the Exchange, to pay Kent & Co. $950; and in like manner, on a purchase of 5000 bushels of wheat from the Culver Commission Company, under like authority, they were compelled to pay said last named company $350. These three payments, aggregating $2375, is the sum that appellants insist they have the right to charge appellees on final settlement and adjustment of their accounts, for two reasons: First, because they were compelled to make such payments in order to carry out the instructions of appellees; and secondly, because such sum was in reality a payment to appellees, they being both buyer and seller, and which sum was accounted for to appellees by their brokers, who received the same from appellants.

There was no dispute of the correctness of the ledger balance of $1368.92, due from appellants to appellees. Mr. Samuels, in his testimony, concedes that indebtedness, and that it accrued in previous transactions having no connection with the one in controversy. This sum, therefore, was properly allowed in the judgment rendered by the trial court.

It is apparent the trial court disallowed appellees' claim to damages under the special counts,—and properly so,—for the reason, among others, there was no evidence of any loss from the failure of appellants to demand margins as a security for the performance of contracts, and because the whole contract of employment was tainted with fraud, and against public policy. No question can arise as to the propriety of the ruling in this respect, for the reason that no cross-errors are assigned.

All that appellants can complain of here, is the refusal of the trial court to allow them a credit, under the plea of set-off, for the $2375 they were compelled to pay for appellees in settling the differences in the deals before referred to, and the allowance of $923.75 against appellants for moneys collected by them in settlement of deals entered into by them on behalf of appellees.

The set-off of $2375 claimed by appellants grows out of the fact that appellants, acting as brokers for appellees, and acting under their instructions, bought 25,000 bushels of wheat on June 27, 1882, at $1.35 per bushel, of parties holding their prior contracts of sale of the same amount of wheat sold for appellees, and to be delivered at the same time, but at a less price. In settling and adjusting these purchases and sales, the one was set off against the other, or balanced, except as to the difference, which, in this instance, was against appellants, and which they were required to and did pay. It appears that it was the universal custom and usage of the Merchants' Exchange of St. Louis to adjust differences in such cases, and this is known as "ringing out." This custom is thus stated and explained by Samuels, one of appellants : "Merchants doing business on 'change frequently have contracts for grain sold and grain purchased, by the same brokers. It is the custom of the brokers with whom we have such contracts, purchased and sold for the same delivery, to settle between ourselves by paying the difference, one way or the other. For instance, if I have wheat sold at $1.20, and afterwards buy the same commodity of the same broker at $1.25, the custom is to settle these transactions by paying the difference in price. In that way Samuels & Sons settled for 25,000 bushels of the 40,000 bought on June 27, for Oliver's account, at $1.35." Oliver is shown to have been upon the floor of the Exchange nearly every day in June, 1882, and was familiar with the particular usages and customs of that board. Appellants, dealing in that market, were necessarily required to conform to the general

usages and customs thereof. A person dealing at a particular market will be taken to have dealt according to the known general custom and usage of that market, and if he employs another to act for him in buying or selling at such market, he will be held as intending that the business should be conducted according to such general usage and custom of such market; and this has been held to be the rule whether he in fact knows of the custom or not. *Bailey* v. *Bensley,* 87 Ill. 556; *Doane et al.* v. *Dunham,* 79 id. 131; *Lyons et al.* v. *Culbertson et al.* 83 id. 33; *Lonergan* v. *Stewart,* 55 id. 44; *Home Ins. Co.* v. *Favorite,* 46 id. 263; Lawson on Usages, 47, 284-287.

If, in executing the instructions of their principals, it became necessary for appellants to pay out money to adjust differences, they, if guilty of no fraud or violation of law, will be entitled to be reimbursed by their principals for their outlay. The principal is bound to indemnify his agent or broker for losses incurred in executing the principal's order. Wharton on Agency, sec. 240; Story on Agency, sec. 239.

If appellants had not aided or assisted appellees in cornering the wheat market, and in manipulating that market for an illegal or fraudulent purpose, so as to enable the latter to control the same for their own profit, and to the injury of all persons having occasion or necessity to purchase such wheat, or had no knowledge of the wrongful and illegal purposes of appellees, there could be no reason why appellees should not be required to indemnify appellants for the moneys they were required to pay to other brokers of appellees,—and such was, as we understand, the ruling of the trial court. Proposition No. 2, asked by the defendants, and held by the court to be the law, is as follows:

"Even if it appear that plaintiffs are precluded from recovering in this action, because the transactions on which the alleged balance is sought by plaintiffs were made by plaintiffs in furtherance of their (plaintiffs') operations in producing what is known as a 'corner' in the market for wheat in St. Louis,

in June, 1882, if it also appear that defendants were not knowingly parties to such unlawful purpose of plaintiffs, and had no interest in said operations further than the earning of their commissions in the purchases and sales made by them, then defendants are not precluded from recovering, on their counter-claim, such sum as may be proven to be due them for expenses and losses incurred by them, and commissions earned."

The same principle was substantially held in the third proposition also asked by the defendants. The court, however, refused propositions Nos. 5 and 7, asked by the defendants, as follows:

"5. If it appear, from the evidence, that defendants, in executing plaintiffs' orders to purchase wheat on the floor of the Merchants' Exchange of St. Louis, for June delivery, on June 27, 1882, made such contracts of purchase in their own names, under customs of said Exchange, from certain other commission merchants, who were also selling in their own names, but really executing the orders of plaintiffs to sell, and that defendants settled their contracts of purchase with their prior contracts of sale of the same commodity, at lower prices for same delivery, by paying the differences thereon; and if it further appear that such prior contracts of sale had been made to said other commission merchants, for plaintiffs, so that the money paid by defendants in settlement was paid to their (plaintiffs') agents, for plaintiffs, then the amount so paid, defendants are entitled to charge against plaintiffs in this action.

"7. If it appear, from the evidence, that plaintiffs instructed defendants, as their agents, to buy about 40,000 bushels of No. 2 red winter wheat on the floor of the Merchants' Exchange of St. Louis, on June 27, 1882, deliverable during the month of June, 1882, at $1.35 per bushel, such purchases to be in defendants' name, but for account of plaintiffs, and according to the customs, rules and usages then prevailing in said Merchants' Exchange; and that defendants did, in executing such

orders and instructions, on that day make such contract to purchase of such commodity for such delivery at said price of $1.35 per bushel, as follows: from D. R. Francis 10,000 bushels, from E. A. Kent & Co. 10,000 bushels, and from the Culver Commission Company 5000 bushels; and that said D. R. Francis, E. A. Kent & Co., and the Culver Commission Company were also brokers doing business in said Merchants' Exchange, and, in making such contracts of sale to defendants, were in fact acting as the brokers and agents of plaintiffs, and said contracts of sale were in fact made by them for account of plaintiffs; and that prior to said June 27, 1882, defendants had made contracts for the sale of the like commodity for the same delivery in the same market, and according to the same customs, rules and usages, as follows: to said D. R. Francis 10,000 bushels at $1.24¼ per bushel, to said E. A. Kent & Co. 5000 bushels at $1.25 and another 5000 bushels at $1.26, and to the said Culver Commission Company 5000 bushels at $1.28 per bushel, all of which contracts to sell were pending and unperformed at the time of the making of said contracts to purchase by defendants, on said June 27, 1882; and that shortly after June 27, 1882, and in accordance with the rules, usages and customs of said Merchants' Exchange, defendants settled and adjusted with said other brokers their respective purchase and sale contracts aforesaid, by defendants actually paying to said other brokers, respectively, the differences between $1.35 per bushel and the respective prices per bushel at which defendants had so contracted to sell to said brokers, respectively; and that upon the final adjustment of said contracts, defendants sustained losses so growing out of executing such orders and instructions of plaintiffs to make such contracts of purchase at $1.35 per bushel, then the defendants are entitled, in this action, to credit, as against any claim of plaintiffs sued for in this action, such amount as the evidence shall show that defendants may have so lost."

6—130 ILL.

From the propositions held by the court, and the facts of the case to which they are applicable, it is evident that propositions Nos. 5 and 7, above quoted, were refused by the court for the reason that they omitted the important consideration, as to whether or not appellants, in settling such differences and making such payments, were not knowingly aiding and assisting appellees in carrying out their scheme of controlling the market. That being so, the trial court must necessarily have found, from the evidence, that appellees were engaged in an unlawful undertaking, and that appellants were aiding and assisting its consummation, with knowledge of the illegal purpose of their engagement. The Appellate Court affirmed the judgment of the Superior Court, and made no special finding of fact, and it must therefore be held to have found the facts the same as the trial court found them. The finding that appellants were guilty of knowingly aiding appellees in an unlawful transaction, necessarily finds that the principal who employed them, and whose instructions they were carrying out, was also knowingly engaged in an illegal transaction. When the facts are admitted, or are found and established from the evidence, the law determines the result which is to follow. If the fact is found that a certain transaction, together with the means and appliances resorted to to consummate it, is illegal, as against public policy, it will follow that all parties participating therein, with knowledge of its character, whether principals or agents, will be alike guilty, and the result will be, that none of them can legally assert any right growing out of the illegal transaction. To say, in such a case, that the agent employed to aid his principal in an illegal enterprise can not recover of his principal for services or money advanced in execution of the illegal purpose, or under his employment, is a correct statement of the law, but the like rule is equally applicable to the principal as to the agent. The court can not say, as a matter of law, that the principal may recover of the agent, and not the agent of the principal. The principal, in such case, can not

recover money he has advanced to the agent to be used by him for such illegal purpose. Nor will the law aid the principal to recover of the agent money received by him in pursuance of his employment, or arising out of the illegal transactions.

We are aware of the rule that this court can not determine questions of fact, but must accept the finding of the Appellate Court as final and conclusive. It is undoubtedly the rule that it will be presumed the law was correctly applied to the facts by the court, unless the record affirmatively shows to the contrary. (*Tibballs* v. *Libby,* 97 Ill. 552 ; *Montgomery* v. *Black et al.* 124 id. 57.) Here, however, propositions of law were submitted which clearly indicate the finding of the court upon the questions of fact. Under proposition No. 2, it would have been the duty of the court to have found in favor of the defendants, had not the transaction out of which the set-off arose been tainted with the illegal and fraudulent manipulation of the market. We do not decide the facts in this case, but act on the finding of the Appellate Court as to the ultimate fact, which is, that the defendants can not recover such set-off account, because the transaction in which they advanced money for the plaintiffs was illegal and against public policy. It is our duty to pronounce the law applicable to the state of facts thus found. That court having found that the object and purpose of the employment of appellants by appellees, and the transactions in which they were engaged, were illegal, we but apply the law, as that court should have done, and refuse to aid either of the offending parties, and leave them in the position where their illegal acts have placed them.

There is no serious question of the illegal purpose for which appellants were employed. It was to give appellees control of the wheat market. They employed a large number of brokers of the city to co-operate with appellants secretly, and to buy up all the wheat actually in market, and at the same time procure contracts for the sale and future delivery of large quantities of such wheat, which they knew could not be had

in the market. The witness J. C. Ewald, at one time president of the Merchants" Exchange and a member of it, says: "By 'cornering the market,' I mean when parties have contracts on hand for a greater amount than the sellers have cash grain to deliver. There was a greater amount of contracts than cash grain to deliver. The supply of cash wheat at that time in the market was owned entirely by Oliver. * * * I arrived at the conclusion that the market was cornered, as above stated, because I knew that a great many owed wheat, at the time, to Oliver and his brokers, that could not deliver it. It wasn't for sale on the market, to deliver on the contracts to Oliver. This was occasioned from the fact that Oliver and his brokers had the wheat due them, and also owned the cash wheat at the time, and those who owed the wheat could not buy it to deliver it. Wheat could not be had at current prices at that time. I know that Oliver had all the cash wheat, from the fact that I had some for him myself, and from the fact that others held it for him, and I know it from the fact that he told me so."

Public policy will not permit appellants to recover for the money advanced by them in the illegal business of appellees, nor will the law give an action to appellees to recover from appellants moneys paid to them by other parties in the prosecution of such illegal enterprise. *Ex turpi causa, non oritur actio.* The enhancement of the price of an article of prime necessity, such as wheat or other articles necessary for food, for purposes of extortion, is against public policy. (*Fuller* v. *Dane,* 18 Pick. 472; *DeWitt* v. *Brisbane,* 16 N. Y. 508.) "Combinations whose object is to create what are known as 'corners' in the market, or to control the traffic in any staple which is a popular necessity, or to enhance the price thereof, or to withhold the same from the market, are illegal." (Greenhood on Public Policy, 642; *Wright* v. *Crabb,* 78 Ind. 487; *Craft* v. *McConoughy,* 79 Ill. 346.) Such a transaction, if had in this State, would be void, as being in contravention of the

Criminal Code. Sec. 130, chap. 38; *Schneider et al.* v. *Turner, ante*, p. 28.

An agreement to make a corner in stock, by buying it up so as to control the market, and then purchasing for future delivery, is illegal, and a party thereto whose funds have been used, by his consent, in carrying out the agreement, can not recover the same back. (*Sampson* v. *Shaw*, 101 Mass. 145.) So it has been held that one who loans or advances money to be used for the purpose of making a corner in wheat, can not recover. (*Lehman* v. *Leavitt*, 46 Mich. 447.) So, also, money paid in furtherance of an illegal transaction or purpose can not be recovered by the party advancing the same. *Ball* v. *Gilbert*, 12 Metc. 397; *Dixon* v. *Olmstead*, 9 Vt. 310; *Wheeler* v. *Russell*, 17 Mass. 258; *The People* v. *Fish*, 14 Wend. 9.

When the employment of an agent relates to the performance of an immoral or illegal act,—it is said by Wharton in his work on Agency, (sec. 25,)—neither party can make the contract the basis of a suit against the other. Advances for illegal purposes fall within the same rule, and can not be recovered by the principal of the agent, or the agent of the principal. (Id. sec. 319.) It follows, therefore, that if one party can not maintain an action in respect of matters growing out of his employment, on account of its being illegal or contrary to public policy, neither will an action lie against him by one participating in the illegal transaction conducted in pursuance of such employment. It would seem self-evident that if the agent who merely aids the principal in the prosecution of an illegal business can not recover for services or money advanced by him in the conduct of the business, the master or principal should not be permitted to recover against the agent for moneys received by him in the course of such business.

If there was no question of illegality involved in this transaction, then, on a settlement, the agent clearly should be allowed for his reasonable commissions, and the amount of

money necessarily and properly advanced by him for his principal, and should be charged with the moneys received in the course of the business, belonging to the principal. 'In other words, in this case appellants should charge appellees $2475, being the money actually paid out by them for their principal, and their commission, and credit them with the ledger account $1368.92, and with the sum $923.75 moneys collected for appellees,—which would leave a balance due appellants of $182.83. But the contract of employment, and the transaction in which they were engaged, being against public policy, the contract, so far as it remains executory, can not be enforced by either party; nor can either party maintain an action against the other for any right growing out of such contract, or of the illegal transaction in which they were engaged. The law simply refuses its assistance to either party.

We are of opinion that the trial court erred in including within its judgment the item of $923.75 for moneys collected by appellants in the course of the business of appellees, and consequently the Appellate Court erred in affirming that judgment.

The judgments of the Appellate Court and Superior Court are reversed, and the cause remanded to the latter court for further proceedings.

*Judgment reversed.*

Mr. JUSTICE BAILEY, having heard this case in the Appellate Court, took no part in its decision here.