SAMPER v. THE INDIANA DEPARTMENT OF STATE REVENUE ET AL.

[No. 28,818. Filed June 23, 1952.]

28

*Ferdinand Samper* and *Richard L. Gilliom,* both of Indianapolis, for appellant.

*J. Emmett McManamon,* Attorney General; *John J. McShane, Lloyd C. Hutchinson, Joseph E. Nowak* and *Robert F. Wallace,* Deputy Attorneys General, for appellees.

*Baker & Daniels; Joseph J. Daniels, Paul N. Rowe* and *Dan R. Winchell* (of counsel), all of Indianapolis, Amici Curiae.

BOBBITT, J.—Appellant owns and operates a business known as J. & R. Radio Service Company in the city of Indianapolis, Indiana. He has a store license issued by the State of Indiana. During the years 1946, 1947, 1948 and the first six months of 1949 appellant's income from said business was derived from the following sources and activities: (1) The sale of radio and television sets, which source accounted for five per cent of his total business income; (2) the sale "over-the-counter" of electronic parts and equipment which were in no way connected with service of any kind, accounted for thirty-two per cent of said income; and (3) the repair of radios and other electronic equipment and the sale and installation of "additional" radio and other electronic equipment and parts. This activity constituted sixty-three per cent of said income of which five per cent are "addition jobs."

Appellant reported and paid tax on activities one and two as a "retail merchant" at the rate of one-half of one per cent. The correctness of this rate is not disputed by appellee.

In the operation of his radio repair service, which was carried on from the same place as was that part of his business consisting of the sale of radios and electronic equipment and repairs, appellant purchased, at the prevailing wholesale prices, and kept in stock for his and his customer's convenience, parts and equipment which might be needed to complete a repair job. Such parts and equipment when so used were invoiced to the repair customer at the prevailing "over-the-counter" price. The profit which appellant realized on parts used in repair jobs was the same as that on identical parts sold "over-the-counter" and not in any way connected with service or repair.

In all repair jobs the customer was charged for the labor involved at the customary prevailing labor charge for such work. The charges for parts and equipment and for labor were separately set out and itemized on each job. A record of each transaction was provided by the use of a three-part detachable card which consists of (1) a claim check in the usual form which is given to the customer at the time he leaves the radio to be repaired; (2) an index card which shows the name and address of the customer, the description of the radio to be repaired together with any specific information regarding the nature of the repairs. This card also contains, under the heading "estimate," the following:

> Tubes
> Material
> Labor
>
> Total          ,

and is retained by appellant; and (3) a service card guarantee which we may assume, from its form, is given to the customer when the repair job is completed and accepted.

During the taxable years here in question appellant, acting pursuant to the provisions of Acts of 1937, ch. 117, §4, p. 604, §64-2604, Burns' 1951 Replacement, separated both on his books and his Gross Income Tax Return, the income received from the charges for parts and equipment used in repair jobs, from that received from charges for labor in connection with such repair. Upon that part of said income derived from parts and equipment appellant reported and paid tax at the rate of one-half of one per cent, and upon that part of said income resulting from labor he reported and paid tax at the rate of one per cent. After audits by the Gross

Income Tax Department an additional assessment was levied against appellant on the theory that the tax reported and paid on income from charges for parts used in repair and "addition" jobs should be at the rate of one per cent because the activity from which the income was derived was the performance of a contract for services. Following an order of the Indiana Review Board confirming said additional assessment, appellant filed his petition in the Marion Circuit Court for a Judicial Review of said order as provided by the Acts of 1947, ch. 365, §14, p. 1451, §63-3014, Burns' 1951 Replacement. From an order of the trial court affirming the order of the Review Board, except as to the five per cent of income derived from "addition" jobs, appellant prosecuted his appeal to this court under §18, p. 1451, of said ch. 365 of the Acts of 1947, §63-3018, Burns' 1951 Replacement.

Three questions are here presented for our consideration:

*First:* Is appellant's income from the activity of repairing and restoring radio receiving sets and other electronic equipment (1) that of a "retail merchant" selling at retail in the ordinary course of his regularly conducted business; or (2) is it income received "for the performance of contracts" for services; or (3) is it income from both which may be segregated for tax purposes under §64-2604, *supra.*

The answer to these questions must be found in the consideration of subsections (j) and (k) of ch. 370, §1, p. 1471, Acts of 1947, §64-2601, Burns' 1951 Replacement; subsections (c) and (g) of ch. 310, §1, p. 1380, Acts of 1945, §64-2603, Burns' 1951 Replacement; and §4, ch. 117, p. 604, of the Acts of 1937, §64-2604, *supra,* as they apply to the facts in the case before us.

They provide as follows:

Section 64-2601, *supra,*

"(j) The term 'retail merchant' means and includes only a person regularly and occupationally engaged in purchasing tangible personal property and selling the same at retail at a fixed and established place of business.

"(k) The term 'selling at retail' means and includes only a transaction by a 'retail merchant' by which the ownership of tangible personal property is transferred, conditionally or otherwise, for a consideration, when such transfer is made in the ordinary course of the transferer's regularly conducted business and at a fixed and established place of business, and is acquired by the transferee for any other purpose than those designated by subsection (a) of sec. 3 [§64-2603] of this act."

Section 64-2603, *supra,*

"(c) With respect to that part of the gross income of every person who is a retail merchant as defined in this act which is received from selling at retail, the tax shall be equal to one-half of one per cent [½%] of such part of the gross income.

. . .

"(g) With respect to that part of the gross income of every person which is received from any source not enumerated in subsections (a) to (f) inclusive, of this section, including, but not in limitation of the foregoing, gross income from professional services, personal services, or services of any character whatsoever, sales of real estate, rentals, *all funds received for the performance of contracts,* all funds received from the investment of capital, all receipts from retail sales and all receipts received from any source whatsoever, the tax shall be equal to one [1] per cent of such part of the gross income. The term 'retail sales' shall mean any sale of any property not included within the definitions of 'wholesale sales' and 'selling at retail.' " (Our italics).

Section 64-2604, *supra,*

"Any person receiving gross income taxable at different rates under the provisions of this act shall be subject to taxation upon his entire gross

income at the highest rate applicable to any part of such gross income unless he shall segregate the parts of his gross income taxable at different rates upon his records and in the returns which he files pursuant to the provisions of this act. Such segregation shall be subject to the review of the department as hereinafter provided."

These sections should, when possible, receive a practical and workable construction. *Department of Treasury* v. *Ridgely, Executrix* (1937), 211 Ind. 9, 18, 4 N. E. 2d 557, 108 A. L. R. 1067; *State ex rel. Shea* v. *Billheimer* (1912), 178 Ind. 83, 89, 96 N. E. 801; *Suabedissen-Wittner Dairy* v. *Dept. of Treas.* (1938), 105 Ind. App. 626, 629, 16 N. E. 2d 964; *Western Leather & Finding Co.* v. *State Tax Commission* (1935), 87 Utah 227, 48 P. 2d 526, 529.

It is first necessary to consider whether or not such income is subject to segregation under section 64-2604, *supra.*

Appellant contends that the income derived from the sale of parts which are used by him in the repair of radios and other electronic equipment, and that derived from labor performed in connection with such repairs, is income from two separate sources or activities and, therefore, he has properly segregated his income as to sales and service within the intent of the provisions of said §64-2604, *supra.*

Appellees contend that the separation of such income is merely a division of income from one source or activity and is not a segregation of income within the meaning of said §64-2604, *supra.*

If appellant is correct, and he has properly segregated his income from repair and service jobs into sales at retail and service, then he is taxable on that part derived from sales at retail at the rate of one-half of one per cent and on that part of his income derived

wholly from labor or service at the rate of one per cent. If appellees are right, then appellant is taxable on the total of said income at a single rate of tax either as a retail dealer under §3(c) of the Gross Income Tax Act at one-half of one per cent, or he is taxable under §3(g) on income received from the performance of contracts at the rate of one per cent.

A taxpayer may have several kinds of income derived from different sources and activities, each of which is taxable at a different rate. Section 64-2604, *supra*, makes it possible for such taxpayer to segregate his income according to its source and pay the rate of tax applicable thereto. "Segregate" as used in said §64-2604, *supra*, means the separation of income among the different classifications of taxable activities as they are defined by §3 of the Gross Income Tax Act. (§64-2603, *supra*).

Appellees further contend that the proceeds derived from a radio repair job is income from the performance of an indivisible contract and as such is not subject to segregation since it is derived from a single source or activity.

If the contract for repair of a radio is such as to be entire or indivisible then the income therefrom is not a proper subject for segregation under the provisions of said §64-2604, *supra*.

This principle was invoked by this court in *Gross Income Tax Div.* v. *Ft. Pitt Bridge Wks.* (1949), 227 Ind. 538, 86 N. E. 2d 685, 87 N. E. 2d 721. The appellee in that case contended that since the steel used in the performance of a contract, calling for the furnishing of labor and materials to erect buildings in Indiana, was fabricated outside the state it was a sale in interstate commerce and, therefore, that part of appellee's income from the contract, represented by the sale

price of the steel, was not subject to the gross income tax. It also contended that the part of its income derived from the labor and work performed under the contract was separate and distinct from that part derived from the sale of steel and was, therefore, subject to segregation under said §64-2604, *supra*. That there were in effect two contracts—one for the sale of fabricated steel in interstate commerce and one for labor and services rendered. This court 227 Ind. at p. 544; 86 N. E. 2d at p. 688, said:

"The first question which presents itself for consideration is whether, as contended by Fort Pitt, there were, in fact, two contracts, one to be performed by Fort Pitt and the other to be performed by Hunter. It seems to us that the transaction is irrevocably characterized by the fact that the bid was made in Fort Pitt's name and Sheet & Tube directed all orders and made all payments to Fort Pitt, not only for fabricating and furnishing the steel, but also for the erection and construction work, and that Fort Pitt permitted this to be done. It was, we think, clearly a single contract, whereby Fort Pitt committed and obligated itself for the entire result. The language of the contract is not unlike the conventional building or construction contract, which obligates the contractor to furnish labor and material and erect and construct in accordance with designated plans and specifications. Such a contract is not dual in nature, calling for the furnishing of material on one hand and, separately and on the other hand, calling for the furnishing of labor to convert such material into a finished structure."

Further, at p. 550:

"As we have already indicated, we do not believe that the contract here involved was a contract of sale with construction work in Indiana as a mere incident. We think it was a contract to furnish material and erect buildings in Indiana. It was what appellant aptly called a *performance contract*.

This being true, the fact that the steel was fabricated and prepared in Ohio for use in Indiana under a contract made in Ohio, is immaterial if, in fact, the fabricated steel was used in the performance of the contract in Indiana and payments to Fort Pitt were dependent upon such use." (Our italics.)

And also at p. 554:

"We hold that the contract between Fort Pitt and Sheet & Tube was indivisible; that it was not a sales contract, but was a contract to furnish material and erect buildings in Indiana . . ."

The usual test of the severability of a contract is the entirety or divisibility of the consideration; and whether a contract is entire or divisible is controlled by the intention of the parties as it is disclosed by the terms of the contract. It is well established that the parties to a contract intend that it be entire and indivisible when by its terms, nature and purposes it contemplates and intends that each and all of its parts, material provisions and the consideration, are common each to the other and interdependent, or whether it could be completed in part only. *Thompson* v. *Fesler* (1919), (Transfer denied 1920), 74 Ind. App. 80, 90, 91, 123 N. E. 188; *Traiman* v. *Rappaport* (1930), 41 F. 2d 336, 71 A. L. R. 475, 479; 17 C. J. S., Contracts, §331, p. 786, 787; 12 Am. Jur., Contracts, §317, p. 873.

The contract entered into when a customer takes a radio or other electronic equipment into appellant's place of business for repair, is not one for the purchase and sale of radio or electronic parts but rather one for the restoration of the item to its useful state and, in consideration of the total sum to be paid by the customer, appellant undertakes to furnish whatever is

necessary, including labor, service, parts and materials to complete the job.

The nature and purpose of such a contract contemplates and intends that, if new parts are needed in the repair, this part of the contract is common to and interdependent upon that part of the contract which calls for the labor and services necessary to complete the repair. Such a contract could not be completed in part only, viz., by performing the labor and services required without furnishing any parts which may be necessary to complete the repair. The contract would not have been completely performed nor the consideration complete without the performance of both, if both were necessary to restore the item to a usable condition.

It may be said that a contract for the repair of a radio involves different things, but it is likewise true that when a customer leaves his radio to be repaired there is "a single consent to a whole transaction." It is evident that the party bringing a radio in to be repaired would not have left it with appellant unless he believed that all the things necessary to restore it to a workable condition would be done.

Appellant under the contract for repair of a radio or other electronic equipment could not have recovered for the parts furnished without having performed the labor necessary to a complete performance of the contract, nor could he have recovered for the labor performed under such contract without having furnished and installed any parts or material necessary to complete the job.

It seems clear beyond dispute that the customer took his radio to appellant because it was out of order and needed repairs, and he sought the knowledge and skill of appellant in making such repairs. He did not

take his radio to appellant's shop solely for the purchase of parts. In other words, he went to appellant's place of business with his broken radio because he thought appellant had the skill and knowledge to, and could and would, restore it to a usable condition.

When measured by the intention of the parties, the contract for the repair of a radio or other electronic equipment under the procedure followed by appellant, includes the furnishing of labor, services and any parts or materials necessary to restore the item to a usable and workable condition, and such a contract is entire and indivisible.

For the reasons above stated, appellant's income from the repair of radios and other electronic equipment is derived from indivisible contracts and it cannot be segregated for gross income tax purposes as to income derived from parts sold and labor performed.

*Second:* Having concluded that the income from appellant's business as radio repairman is not subject to segregation for gross income tax purposes, we must now determine under what classification the total income from this source is taxable.

The rate of tax is determined by the source or activity from which each item of the gross income is received, and does not depend upon the general character of the business in which the taxpayer is primarily engaged. *Oster* v. *Department of Treasury* (1941), 219 Ind. 313, 318, 37 N. E. 2d 528; *Storen* v. *J. D. Adams Mfg. Co.* (1937), 212 Ind. 343, 348, 7 N. E. 2d 941; *Dept. of Treas.* v. *Fairmount Glass Wks., Inc.* (1943), 113 Ind. App. 684, 688, 49 N. E. 2d 1; *Suabedissen-Wittner Dairy* v. *Dept. of Treas.* (1938), 105 Ind. App. 626, 630, 16 N. E. 2d 964, *supra.*

Appellees contend that the primary purpose in a repair shop such as here under consideration is the

restoration of property to its operational functioning, and the furnishing of materials necessary thereto is but an incident to that primary purpose.

Is the activity sought to be taxed "selling at retail" in which service is incidental to the sale, or is the source of appellant's income that of furnishing services under a contract for the repair of radios or other electronic equipment in which the supplying of parts and material is incidental?

This question cannot be determined solely by the ratio which the value of the parts or materials used bear to the cost of the service rendered. *Mahon* v. *Nudelman* (1941), 377 Ill. 331, 36 N. E. 2d 550, 552.

The question here before us is one of first impression in this court. However, comparative situations, even though most of them deal with new articles and not with the repair of used articles, have been considered, and the reasoning in those cases is applicable and may be of some assistance in the factual situation now before us.

In *Clark's L. & Dry C. Co.* v. *Dept. of Treasury* (1937), 103 Ind. App. 359, 5 N. E. 2d 683, the Appellate Court had under consideration the question of the rate of gross income tax applicable to income derived from the source of laundry and dry-cleaning business. Appellant there contended that since it was engaged in preparing articles or substances for use it was, therefore, entitled to the rate provided by subsection (a) of §3, of the Gross Income Tax Act of 1933, while appellees contended that the applicable rate was fixed by subdivision (f) of said section, because the income of appellant was received "for the performance of contracts for personal service" and was, therefore, taxable at the rate of one per cent. In sustaining appel-

lees' contention the Appellate Court, at pp. 363, 364, (103 Ind. App.) said:

"After a careful consideration of the entire act, of which section 3 forms a part, we are convinced that when the legislature used the phrase 'preparing for sale, profit, or use' in subdivision (a) of section 3, it did not intend to make income received because of service rendered in making articles which had already been in use, more desirable for use again, taxable at the rate imposed by said subdivision (a). To give the phrase employed such meaning would, in our opinion, be to disregard other provisions of said section 3, and particularly subdivision (f) thereof which imposes a tax at the rate of one per cent upon the income from any business or activity not previously enumerated in said section 3."

In *Indiana Creosoting Co.* v. *McNutt, Governor* (1936), 210 Ind. 656, 5 N. E. 2d 310, appellant was engaged in the business of creosoting railroad ties in Bloomington, Indiana. It contended that it was engaged in manufacturing, compounding and preparing for sale articles at its plant in Bloomington, and the income derived from such activity was taxable at one-fourth of one per cent. At p. 667 (210 Ind.) this court said:

"The work done in creosoting the ties is nothing more than a service rendered for the purpose of preserving them and can not be placed in the classification of manufacturing, compounding, or preparing for sale, profit, or use of any article any more than could the painting of a house, buggy, or wagon. The service of all is for the same purpose —preservation of the material, the only difference being the method of the work and the material used."

Appellant's income was held to be derived from the activity of creosoting ties, including materials used,

(service) and was taxable at one per cent under §3(f) of the Gross Income Tax Act.

In *Department of Treasury* v. *Ridgely, Executrix* (1937), 211 Ind. 9, 4 N. E. 2d 557, 108 A. L. R. 1067, supra, this court was called upon to construe subsection (c) of said §3 as it applied to the filling of prescriptions by druggists. Appellee contended that the income from such source was taxable under subsection (a) as being derived from compounding or preparing for sale certain articles. The court, at p. 18, said:

"Does it seem reasonable to say that the legislature intended to tax the gross income derived from the sale of any article that involved the act of compounding, at the rate of one-fourth of one per cent, without considering the character of his business or any other fact or circumstance connected therewith. That would be unreasonable."

This court there, in effect, held that the preparation of prescriptions was but an incident to the sale of drugs for final consumption, and that the income derived therefrom was taxable at the rate provided for retail merchants selling at retail.

*Gross Income Tax Div.* v. *Conkey Co.* (1950), 228 Ind. 352, 90 N. E. 2d 805, was an action to recover sums paid as gross income tax on income derived from the printing and binding of books and from the sale of bookcases. All of the books were made by appellee on order of its various customers. By the terms of these orders or contracts the publisher-customer furnished the manuscript which appellee printed and bound into a book. In all these orders appellee furnished all the material used in the making of the books, except in certain instances the customer furnished the paper while appellee furnished the other materials necessary for the printing and binding. Ap-

pellee contended that its income from the printing and binding of books was derived from the manufacture and sale of books in interstate commerce and not from the rendition of local service. In determining the source from which appellee's income was derived this court, at pp. 357, 358, said:

"It would seem to us that as to the printing and binding of books, as here, the appellee was rendering a local service and the gross receipts therefrom are not from interstate commerce. What appellee was being paid for was the services rendered and its materials used in an activity purely local in its nature. *Dept. of Treasury of Indiana* v. *Ingram-Richardson Mfg. Co.* (1941), 313 U. S. 252, 85 L. Ed. 1313, 61 S. Ct. 866; *Western Live Stock* v. *Bureau* (1938), 303 U. S. 250, 82 L. Ed. 823, 58 S. Ct. 546. Its contracts were not for the sale of books, nor for a sale of the materials furnished by appellee which went into the books, but for work, labor and materials which ultimately resulted in the transfer of a chattel made especially for the buyer and not suitable for sale to others in the ordinary course of appellee's business. By the weight of authority in this country such a contract would not amount to a sale. 46 Am. Jur., Sales, §12, p. 206; *Yoe* v. *Newcomb* (1904), 33 Ind. App. 615, 71 N. E. 256. Also by the adoption of the Uniform Sales Act this state has recognized the rule that contracts such as we have here are not contracts for the sale of goods. Section 58-104, sub-section 2, Burns' 1943 Replacement." . . . "After delivery the appellee's claim would still be for work, labor and material. Even in England where the rule is liberal as to what are contracts of sale, it has been said, 'If the contract be such that, when carried out, it would result in the sale of a chattel, the party cannot sue for work and labor; *but if the result of the contract is that the party has done work and labor which ends in nothing that can become the subject of a sale, the party cannot sue for goods sold and delivered. The case of an attorney employed to prepare a deed is an illustration of this latter proposition. It cannot*

> *be said that the paper and ink he uses in the preparation of the deed are goods sold and delivered. The case of a printer printing a book would most probably fall within the same category.'* (Our italics.) *Lee* v. *Griffin,* 1 Best & Smith 272, 121 Eng. Reprint 716, 23 Eng. Rul. Cas. 191. See also *J. A. Burgess Co.* v. *Ames* (1935), 359 Ill. 427, 194 N. E. 565; *H. G. Adair Printing Co.* v. *Ames* (1936), 364 Ill. 342, 4 N. E. 2d 481. Appellee was the printer and not the publisher of books. Its gross income did not depend upon the acceptance of the books. *It came from a work order and not from a purchase order.* [Our emphasis.] Its income was earned when the books were completed."

The Circuit Court of Appeals, Seventh Circuit, in *Ingram-Richardson Mfg. Co.* v. *Department of Treasury* (1940), 114 F. 2d 889, had before it the question as to whether or not gross income received by the owner of an enameling factory located in Indiana was derived from "services" or from "wholesale sales" within the meaning of the Indiana Gross Income Tax Act. Appellant there was engaged in the manufacture of enamel which was fused with metal parts used in stoves and refrigerators, which metal parts were sent by customers to appellant's factory in Frankfort, Indiana, and after the completion of the enameling process, the identical parts were returned to the customers. Appellant contended that its source of income was the sale of tangible personal property. It argued that its business consisted of the sale of the metal which was used in connection with the enameling process. The court, at p. 892, said:

> "Clearly, we think its income was derived from the rendition of service, which included numerous elements such as labor, transportation and equipment expense. True, there was included the value of the material. Just what part of the total income this represented, the record does not disclose, but

even if it did, it would not, in our opinion, constitute a sale within the meaning of the Act."

The Supreme Court of the United States in *Dept. of Treasury* v. *Ingram-Richardson Mfg. Co.* (1941), 313 U. S. 252, 61 S. Ct. 866, 85 L. Ed. 1313, sustained the Circuit Court of Appeals in holding that respondent's income, from the operation of enameling stove parts, was derived from the rendition of services and not as a result of sales.

Questions similar to the one before us have arisen in other states which have a retail sales law and where the interest of the taxpayer lies in proving that he is *not* "selling at retail" within the definition of the various sales tax acts.

In *Sidney Stevens Implement Co.* v. *Hintze* (1937), 92 Utah 264, 67 P. 2d 632, 111 A. L. R. 331, an action was brought under the Uniform Sales Act to recover the balance owing on a verbal contract between the parties under which appellant constructed an automobile trailer for the appellee. In determining whether this transaction was a sale under the Uniform Sales Act, the Supreme Court of Utah, at p. 636, (67 P. 2d) said:

"We think that under the evidence the contract between plaintiff and defendant, relative to the construction of the trailer, was one for work, labor, and materials and not one of sale."

In *Zook* v. *Perkins, Director of Revenue* (1948), 118 Colo. 464, 195 P. 2d 962, the Supreme Court of Colorado held that under the Colorado Emergency Retail Sales Act of 1935 a person engaged in the business of recapping tires, did not sell an article which was manufactured by him but rendered a service by repairing and restoring an article theretofore manufactured,

and hence no sales tax was collectible on the income from such activity.

In *Babcock* v. *Nudelman* (1937), 367 Ill. 626, 12 N. E. 2d 635, the Supreme Court of Illinois was required to construe a rule of the Department adopted under the Retailers' Occupation Tax Act entitled, "An Act in relation to a tax upon persons engaged in the business of selling tangible personal property to purchasers for use or consumption." The rule in question provided that optometrists and oculists were not liable for the retailers' occupation tax on income received from professional services such as examination and refraction of the eyes or ocular care and treatment. However, if the optometrist or oculist sold spectacles, eyeglasses, lenses, frames, or other tangible personal property to users or consumers, they would be liable for the tax with respect to income received from such sale. In determining this question, the Supreme Court of Illinois, at p. 637, (12 N. E. 2d) said:

> "The lenses furnished are the result of skilled mechanical grinding and preparation. The ocular examination of the recipient of the service demands a high degree of skill. These things are the main objectives. While it is true that frames are furnished and their price considered in the ultimate attainment of the purpose, it is purely incidental to the main object sought to be accomplished." . . .

> "The furnishing of tangible personal property such as eyeglasses to a purchaser, under the circumstances of this case, is merely incidental to the services rendered, and the person making the transfer is exempt from the operation of the taxing statute."

*Mahon* v. *Nudelman* (1941), 377 Ill. 331, 36 N. E. 2d 550, *supra,* arose also under the Retailers' Occupation Tax Act of Illinois and involved an attempt of the Department to collect the tax from appellants measured

by the sales of certain material used in repairing, re-modeling, and restyling fur coats and other fur pieces. Appellants conducted a business of selling fur coats about which no question was raised in the case. They also conducted a separate department for repairing and restyling fur garments for a fixed sum, which included the cost of labor and materials plus overhead and profit. Appellants furnished, from their stock, the necessary fur pieces or strips and linings, where needed, to complete the repairing or restyling of the garments. An average of fifteen per cent of the repair contract was for materials, twenty-five per cent for labor and the remaining sixty per cent for overhead and profit. When a customer brought a fur coat in to be repaired, the pieces of skin to be used in the repair were selected by the dealers without any intervention of the customer who relied upon the skill of the dealers to select the proper materials, both as to quantity and quality. The Director of Finance attempted to collect the Retailers' Occupation Tax in such cases where garments were remodeled, altered or repaired. The dealers had separated on their books charges for labor, time and materials. The tax there is imposed upon persons "engaged in the business of selling tangible personal property at retail." It is an occupation tax although sales are taken as a measure of the tax to be assessed. In determining whether the business sought to be taxed was selling personal property at retail in which service was incidental, or whether it was selling service in which supplying materials or making retail sales was incidental, the Supreme Court of Illinois, at p. 554 (36 N. E. 2d) said:

> "It is conceded that the plaintiffs are engaged in the fur repair business. It is a matter of general knowledge that a fur garment in need of

repair cannot generally be restored to a serviceable condition without the installation of some material, either new or used, and that such repairing requires the skill of the furrier to match the fur as well as to fit linings, etc. In this case it is stipulated that when the customer brings in a garment it is for the purpose of repair, and that the selection, matching and fitting in of fur pieces or lining material used, is left to the choice and skill of plaintiffs. It is evident from this record that the thing sought by the customers of the plaintiffs and furnished by them is the repair of fur garments and fur pieces brought in by them. The use of materials necessary to the primary purpose of the contract is incidental to it."

It seems to us that the factual situation in the case at bar and that found in *Mahon* v. *Nudelman, supra,* are analogous and the reasoning followed by the Supreme Court of Illinois there is equally applicable to the question now before us. We are here required to determine whether the source of appellant's income received from his radio repair business is that of a retail merchant selling at retail, in which the service rendered under the repair contract is incidental, or whether appellant is, under the repair contract, selling services, in which the supplying of materials and selling of parts is but incidental.

In order for appellant to classify his income from his radio repair business as receipts of a retail merchant from sales at retail, it must appear that such income was derived from "selling at retail" rather than from the performance of service under his repair contracts. Appellant in the case at bar concedes that he is engaged in the business of repairing radios and other electronic equipment as a part of his general business. It may be said of radios, as of fur garments in need of repair, that they cannot generally be restored to a serviceable and usable con-

dition without the installation of some parts or materials, either new or used, and that the repair of radios and electronic equipment requires the skill of a person specially trained in that business. It is not disputed that when a customer brings a radio into appellant's place of business for the purpose of having it repaired the question as to whether any replacement parts or materials are needed and, if so, what kind or type, is left entirely within the discretion of appellant's repairman. It seems evident to a point beyond dispute, that the primary thing sought by a customer when he brings his radio into appellant's place of business for repair is the restoration of it to a usable condition—the repair of the radio—and that is the thing furnished by appellant under his agreement to restore—to make the radio function. The use of parts and materials necessary to put the radio in a usable condition is incidental to the primary purpose of the contract, and the sale of such materials as are used in appellant's repair jobs is but an incident to his repair business.

The evidence in the case at bar shows that the parts and material used in repair jobs are selected by appellant and in many instances installed without the prior knowledge or consent of the customer. The purpose of a customer in seeking a radio repairman is to obtain some person who possesses the skill, knowledge and experience necessary to determine (1) the repairs that are needed, and (2) to make the repairs necessary to restore the radio to a usable condition.

The case at bar is also analogous to *Gross Income Tax Div.* v. *Conkey Co.* (1950), 228 Ind. 352, 90 N. E. 2d 805, *supra,* in that the contracts for repair of radios and electronic equipment were not for the sale of parts and materials furnished by appellant which go into the radio or other equipment, but were for

work, labor and materials which ultimately resulted in the repair and restoration of an existing chattel and such contracts would not, as stated by this court in *Gross Income Tax Div.* v. *Conkey Co., supra,* amount to a sale any more than did the contracts for work, labor and materials used and furnished in the printing and binding of books. Neither would such a contract be one for the sale of goods under the Uniform Sales Act.

As in the Conkey case, if appellant's repair contracts be such that, when carried out, they would result in the sale of tangible personal property at retail appellant could not sustain a suit for services and labor performed. However, under the facts in this case it seems clear that if appellant should be forced to file suit to collect money due on a radio repair contract, the suit would necessarily be for labor and services performed and materials furnished in repairing a radio. Appellant could not recover for labor and services performed in a suit for the sale and delivery of tangible personal property.

When the substance of a contract, as the one here under consideration, is to make repairs or improvements to a chattel already in existence, the consideration to be paid to the person doing the work is not for the transfer of "ownership of tangible personal property" but is for services rendered (work and labor performed) and parts and materials furnished in repairing or improving the chattel.

While it may be true, as contended by amici curiae, that the ownership of tangible personal property is transferred from appellant to the customer, yet, in order for such transfer to come within the statutory definition of "selling at retail" it must be made "by a retail merchant in the ordinary course

of the transferer's regularly conducted business . . ." When a radio part is taken from appellant's stock, which he maintains for sale in the regular course of his business as a retail merchant, and is used by him in his activity of repairing radios to replace a broken or worn part, it cannot be said that the transfer of ownership of such part is made in the ordinary course of appellant's regularly conducted business as a retail merchant. Even if it be so conceded, we are faced with the provisions of subsection (g) of §64-2603, *supra,* which provides that Gross Income . . . received from "services of any character whatsoever" and *"all funds* received from the performance of contracts . . ." shall be taxed at one per cent. (Our italics.)

We are of the opinion that appellant's total gross income from radio and other electronic repair contracts comes within the provisions of this subsection (g), §64-2603, *supra,* and should be taxed as funds received from the performance of service contracts at the rate of one per cent.

*Third:* Appellant contends that the effect of the trial court's decision is to make a distinction between income from radio "addition" jobs and radio "repair" jobs, and argues that there is no basis for such distinction. By an "addition" job is meant the installation of a new and additional unit in a cabinet owned by the customer, i.e., a customer purchases a cabinet built for a radio, television and record playing combination, but at the time of purchase only the television unit is installed. Later such customer decides to buy a radio unit for installation in the cabinet which houses his television. The customer goes to appellant for the purpose of purchasing the radio unit but in order to place such unit in a usable condition and induce the customer to make the purchase

appellant must, as an incident to the sale, install such unit in the customer's cabinet. This appellant designates as an "addition" job. We cannot agree that there is no distinction between income derived from "addition" jobs and "repair" jobs, because in the "addition" jobs appellant owns the property (the additional unit) which is to be and is installed, while in a repair job the customer owns the property upon which service is required to restore it to a usable condition. In the former instance the customer is buying a new unit, and installing service is incidental, while in the latter he is buying service (repair) and replacement parts are incidental. In the "addition" job transaction the principal and primary purpose of the customer is the purchase of a new unit (chattel) and the service which appellant renders in placing the chattel in an acceptable salable condition is merely an incident to the sale. In such case appellant transfers tangible personal property in the ordinary course of his regularly conducted business as a retail merchant and such transactions are taxable at the rate provided for retail merchants as defined in the act.

It is the duty of this court to construe the law as written by the legislature. In this case we have applied the law as we find it to the facts presented by the record before us. If the Gross Income Tax Law, as written, results in inequities and imposes a burden on the class of taxpayers to which appellant belongs, which to them seems unfair, the remedy lies with the legislature and not with this court.

For the reasons hereinabove set out, the judgment of the trial court is affirmed.

Judgment affirmed.

Emmert, J., dissents with opinion.

Note: Reported in 106 N. E. 2d 797.

## DISSENTING OPINION

EMMERT, J.—We should be very careful that we do not stretch the tax laws by implication to tax gross income at a higher rate than the law prescribes, since it is perfectly ethical and proper for any taxpayer to avoid higher tax rates if he can conduct his business so a lower rate applies. The evasion of taxes justly due under a statute is a wrong done the government, but it should be noted, and always remembered, that it is just as immoral and evil for the sovereign, acting through its tax agents, to extract money not due in the guise of taxes from one of its citizens, as it would be for the taxpayer by fraud and deceit to seek to evade taxes he justly owes to his sovereign. See *Bullen* v. *Wisconsin* (1916), 240 U. S. 625, 630, 631, 36 S. Ct. 473, 60 L. Ed. 830, 835; *Superior Oil Co.* v. *Mississippi ex rel. Knox* (1930), 280 U. S. 390, 50 S. Ct. 169, 74 L. Ed. 504.[1]

"We said recently with reference to another section of the Gross Income Tax Act of 1933 that 'in case of doubt such statutes are to be construed more strongly against the state and in favor of the citizen.' *Department of Treasury* v. *Muessel* (1941), 218 Ind. 250, 32 N. E. (2d) 596." *Oster* v. *Department of Treasury* (1941), 219 Ind. 313, 317, 37 N. E. 2d 528.

The tax rate under the Gross Income Tax statutes depends upon the transaction by which the gross in-

---

[1] "We do not speak of evasion, because, when the law draws a line, a case is on one side of it or the other, and if on the safe side is none the worse legally that a party has availed himself to the full of what the law permits. When an act is condemned as an evasion, what is meant is that it is on the wrong side of the line indicated by the policy if not by the mere letter of the law." *Bullen* v. *Wisconsin* (1916), 240 U. S. 625, 630, 631, 36 S. Ct. 473, 60 L. Ed. 830, 835.

come is received by the taxpayer. "In *Storen* v. *J. D. Adams Mfg. Co.* (1937), 212 Ind. 343, 348, 7 N. E. (2d) 941 (rev'd on other grounds, 304 U. S. 307, 58 S. Ct. 913, 82 L. Ed. 1365), it was said that 'the rate does not depend upon the business in which the taxpayer is primarily engaged, but upon the activity from which each item of his gross income is received.'" *Oster* v. *Department of Treasury* (1941), 219 Ind. 313, 318, 37 N. E. 2d 528, *supra.* See also *Freeman* v. *Hewit* (1946), 329 U. S. 249, 67 S. Ct. 274, 91 L. Ed. 265. If an item of this transaction here under inquiry is a sale at retail, I cannot escape the conclusion that the appellant is entitled to one-half ($\frac{1}{2}$) of one (1) per cent rate as prescribed by §64-2603 (c), Burns' 1951 Replacement, which provides:

"(c) With respect to that part of the gross income of every person who is a retail merchant as defined in this act which is received from selling at retail, the tax shall be equal to one-half of one per cent [$\frac{1}{2}$%] of such part of the gross income."

Clause (k) of §64-2601, Burns' 1951 Replacement, provides:

"(k) The term 'retail merchant' means and includes only a transaction by a 'retail merchant' by which the ownership of tangible personal property is transferred, conditionally or otherwise, for a consideration, when such transfer is made in the ordinary course of the transferer's regularly conducted business and at a fixed and established place of business, and is acquired by the transferee for any other purpose than those designated by subsection (a) of sec. 3 [§64-2603] of this act."

There is nothing in this definition in the Gross Income Tax Act which is in conflict with the Uniform Sales Act. Section 58-101, Burns' 1951 Replacement, even

though the tax act does not call the "consideration" for the sale the "price."[2]

Section 64-2604, Burns' 1951 Replacement, evidences a clear legislative intent that the taxpayer shall have the benefit of any lower rate by classifying the items on which the lower rate applies. This section states:

"Any person receiving gross income taxable at different rates under the provisions of this act shall be subject to taxation upon his entire gross income at the highest rate applicable to any part of such gross income unless he shall segregate the parts of his gross income taxable at different rates upon his records and in the returns which he files pursuant to the provisions of this act. Such segregation shall be subject to the review of the department as hereinafter provided."

The last sentence providing for review does not mean that the Gross Income Tax collectors have any right to change the law as enacted by the statutes, but only that the taxpayer's classification is subject to correction if erroneous in fact under the law.

Appellant's brief is deficient in its statement of so much of the evidence "as is necessary to present accurately and concisely a full understanding of the questions presented." However, the appellees do not seek an affirmance of the judgment on this ground, but have set forth in their answer brief recital of the evidence concerning the nature of the transactions. Briefly stated, the question presented is, may a taxpayer, who does electrical repair work at a regularly established place of business, make his contracts with his customers so that he sells them at retail the parts neces-

---

2 "A sale of goods is an agreement whereby the seller transfers the property in goods to the buyer for a consideration called the price." Section 58-101(2), Burns' 1951 Replacement.

sary to operate a radio and be taxed at one-half of one per cent [½%], which is the retail rate?

The question is one of great importance to hundreds of taxpayers who are now segregating the gross income received from the transfer of title to thousands of mechanical parts used in the repair of various items of machinery, accessories and mechanical devices. The custom and usage in billing the customer by separately itemizing parts as sales at retail from the labor charges is so general this court can properly take judicial notice thereof. 9 Wigmore, Evidence (3rd Ed.), §2580.

The record in this case discloses that the appellant separately itemized charges for parts from the labor involved in testing to determine the defective part and replacing the defective parts with new parts. The customers must be presumed to have contracted with the appellant according to his customary manner of doing business, and this court has no right to restrict his liberty of contract by saying he cannot do business that way. In *Brunson* v. *Cromwell* (1918), 134 Ark. 605, 204 S. W. 303, the operator of a threshing machine customarily took as toll one-tenth of the grain threshed by the farmers. In the years 1915 and 1916 under a special contract he charged the appellant ten cents per bushel. In 1917 there was no special contract, and the Supreme Court of Arkansas held the appellant, in the absence of a special contract, was bound by the customary toll charge. As stated in *Steidtmann* v. *Joseph Lay Co.* (1908), 234 Ill. 84, 88, 89, 84 N. E. 640, "A person entering into a contract in the ordinary course of business is presumed to have done so in reference to any existing general usage or custom relating to such business. (*Collins Ice Cream Co.* v. *Stephens*, 189 Ill. 200; *Chisholm* v. *Beaman Machine*

*Co.,* 160 id. 101; *Leavitt* v. *Kennicott, supra.*) And this is so whether he knew of the custom or not. (*Samuels* v. *Oliver,* 130 Ill. 73; *Taylor* v. *Bailey,* 169 id. 181; *Lyon* v. *Culbertson,* 83 id. 33; *Doane* v. *Dunha*m, 79 id. 131; *Bailey* v. *Bensley,* 87 id. 556.)" See also, 3 Williston, Contracts (Rev. Ed.) §661, p. 1902.

It does not require any expert on radios to know that radio tubes, coils, condensers and resistors could not themselves be economically or satisfactorily repaired by a radio repairman. Each of such new parts when required for a radio would fit any other radio of the same make and model just as well as the one being repaired. The only labor involved, after ascertaining the defective part, would be in inserting the new tube in its socket, or unsoldering a connection to the defective coil, condenser or resistor and resoldering the connection to the new part. The situation is entirely different than that involved for instance in the repair of a motor or generator which needs rewinding. The motor or generator is the same, and the defective part is the same with the exception of being rewound. Clearly the work involved in the repair of radios is totally unlike that involved in professional work such as done by a lawyer in drafting a complicated trust deed on paper worth but a few cents.[3]

---

[3] The distinction between professional services and mechanical labors involved in this appeal was well noted by the Supreme Court of Louisiana in *State* v. *Cohn* (1936), 184 La. 54, 58, 165 So. 449, in its definition of a profession, as follows: "'Very generally the term is employed as referring to a calling in which one professes to have acquired some special knowledge, used by way of instructing, guiding, or advising others or of serving them in some art; and employment, especially an employment requiring a learned education; an occupation that properly involves a liberal education or its equivalent and mental, rather than manual, labor, especially one of the three learned profes-

In this appeal, the customers who came to appellant's radio shop received a transfer of title to goods which went into their radios to make them operate satisfactorily. They were separately billed for these at retail prices as was appellant's custom and usage of doing business. No labor was expended on any new part to make it usable nor was any old part repaired so it could be used again. The retail price for the parts was clearly stated on the receipt and guarantee given the customer. Title to the parts passed to the buyer for the named consideration, which is selling at retail under the clear terms of §64-2601(k), Burns' 1951 Replacement. We are not at liberty to say the appellant could not make his contracts in this manner to qualify as "selling at retail." The exhibit set out in appellees' answer brief shows the price for parts on a radio job as $8.00, and labor $2.00. The situation presented here is entirely different from the dry cleaning business, the enameling business, the bookbinding business, the optometry profession, or the repair of fur coats. There is nothing in the Gross Income Tax Act that prevents any person from having in one contract provision for the sale of goods, wares and merchandise and another separate provision for labor with reference thereto. The consideration for the transfer of title to the goods was separately stated. This is all that is required to make the transfer of title to the goods a sale under the facts in this record. The appellant should have been allowed the tax rate of one-half of one per cent on the radio parts used

sions; any calling or occupation involving special mental and other attainments or special discipline, as editing, acting, engineering, authorship. The word implies professed attainments in special knowledge as distinguished from mere skill; intellectual skill as distinguished from that used in an occupation for the production or sale of commodities; . . .' "

to put the radios in operating condition. We are not giving the appellant any remedy by "due course of law" for "injury done to him in his. . . . property"[4] when we, by judicial construction, nullify §64-2601(k), Burns' 1951 Replacement, and suggest his remedy is with the General Assembly. We take the statutes as we find them, and any taxpayer should have the right to rely on them as written, and make his contracts with his customers in any manner not forbidden by statute or public policy.

NOTE.—Reported in 106 N. E. 2d 797.

---

[4] Section 12, Article 1, Indiana Constitution.