## CONTINENTAL ROLL & STEEL FOUNDRY CO. v. DEPARTMENT OF TREASURY OF INDIANA et al.

### No. 7366.

Circuit Court of Appeals, Seventh Circuit.

Jan. 27, 1941.

Frederick E. Matson and Harry T. Ice, both of Indianapolis, Ind., for appellant.

J. W. Hutchinson and J. P. McNamara, both of Indianapolis, Ind., for appellees.

Before SPARKS and KERNER, Circuit Judges, and LINDLEY, District Judge.

LINDLEY, District Judge.

Plaintiff, a manufacturer of steel rollers or rolls and annealing equipment, brought suit in the District Court to recover an alleged over-payment of gross income tax, assessed and paid under the Statute of Indiana at the rate of one per cent, claiming

that the rate should have been only one-fourth of one per cent. From the judgment in favor of defendants, plaintiff appeals.

The ultimate question adjudicated in the District Court and presented here is whether, under the law of Indiana, the gross income of plaintiff, derived from the sale of the products involved, represents income from wholesale operations as defined in the statute. The District Court held to the contrary.

The statute, Acts of Ind.1937, chap. 117, sections 1, 2, 3, 64-2601 to 64-2603, Burns Ind.Stats.Ann.1933, Supp., provides that the tax upon income from wholesale sales shall be .equal to one-fourth of one per cent thereof, defining wholesale sales as follows: "Sales of any tangible personal property as a material which is to be directly consumed in direct production by the purchaser in the business of producing tangible personal property by manufacturing, processing, refining, repairing, mining, agriculture, or horticulture" and as "Sales of any tangible personal property which is to be incorporated by the purchaser as a material or an integral part into tangible property produced by such purchaser in the business of manufacturing, assembling, constructing, refining, or processing."

Following these definitions, the statute includes this proviso: "Provided, further, that the term 'consumed' as used herein shall refer only to the immediate dissipation or expenditure by combustion, use, or application, and shall not mean or include, the obsolescence, discarding, disuse, depreciation, damage, wear, or breakage, of tools, dies, equipment, rolling stock or its accessories, machinery, or furnishings."

The act further provides that all income other than that within the definition of wholesale sales shall be deemed income from retail sales and taxed at one per cent.

Plaintiff insists that the products from sale of which the income assessed was derived constitute "material to be directly consumed in direct production by the purchaser" in manufacturing tangible personal property; or are "personal property to be incorporated by the purchaser as a material or an integral part of tangible property manufactured" by the purchaser; that these products are consumed in the sense intended by the proviso quoted in that they are "immediately dissipated or expended by combustion, use, or application," and

that the facts disclose that they are not within that class of property excluded from the tax by the proviso, such as tools, dies, equipment, machinery and furnishings, which become obsolescent, depreciated, damaged, worn out or broken.

The trial court, however, found, and defendants contend here, contrary to plaintiff's position, that the income arose from retail sales for the reason that the property sold was not to be directly consumed in direct production of manufactured articles, or incorporated as material or integral parts of a product; that it was not immediately dissipated but constituted tools and equipment which became useless solely because of wear from their utilization in the business of manufacturing.

There is little dispute as to the character of the products, steel rolls and steel annealing boxes and bottoms. The rolls perform in a steel mill the function of shaping by a rolling process into the desired shape the steel produced in the mill. They are massive and heavy, running as much as fifty-six inches in diameter and consisting of homogeneous masses of metal. The steel in its original form passes into and between two working rolls above which is a backing-up roll functioning as a stiffener. The working rolls do not have sufficient strength to withstand the severe strains and the backing-up rolls re-enforce them and help carry the load. The rolls vary in weight from 65 pounds for the smallest to 106,000 pounds for the largest and work under tremendous pressures, running as high as 700,000 pounds per square inch. They are placed in housings and used again and again in the process of rolling steel as aforesaid until they lose their efficiency as factors in the manufacturing process. The tremendous temperatures and strain from pressure in operation soon produce a checking of the surface. The rolls are thereupon turned in lathes or redressed and again placed in use, their life being limited to the number of times that this returning or redressing can be successfully done. In some instances there may be six or seven corrections of the rolls and in others ten times as many. But as might be expected, the total useful life is comparatively short. Certain rolls are used no more than two weeks before being reconditioned; their fruitful life in the manufacturing process varies from two weeks for the lowest to twelve months for the highest. When they can no longer produce

efficient results, they are discarded and go into scrap iron or steel in the mill.

The other products are annealing boxes and bottoms, made of cast steel. Steel to be annealed is placed within the box which is then sealed. A bottom is mortised around the outside to make a closure after the cover is in place and then the entire mass is placed in an annealing furnace where it remains from seventeen to fifty hours, depending upon the treatment desired. The purpose of this process is to change the grain structure of the steel so as to increase its ductility and tensile properties. In ordinary language, steel is annealed to make it softer. The boxes, subjected to high temperatures, gradually disintegrate, the heat causing slow oxidation, which increases with use. They cannot be rebuilt or reconditioned. They may sometimes be patched and are used many times before they finally lose their utility and are discarded. Their average life covers from 240 to 280 different heating periods, of seventeen to fifty hours each in duration. When they become so deteriorated as to be of useful value no longer as boxes, they, too, are thrown into the scrap heap.

We are of the opinion that the ruling of the taxing authorities and the judgment of the District Court were correct. Obviously, neither the rolls nor the boxes entered into or became material or integral parts of any manufactured product. Rather each of them was a means or an appliance employed in the process of manufacture. Though each of them deteriorated gradually, the boxes because of the heat, and the rolls because of the heat and pressure, this process was not immediate in any proper statutory sense of the statutory word but rather gradual and progressive. Their combustion was not such as occurs when coal is consumed in the process of producing heat. It was not immediate consumption in the sense of the destruction of oil used in lubricating an engine. Their decease as useful appliances arose from the gradual decay occurring in all machinery and all physical things due to wear and tear and the effects of age, under the particular environment encountered. Brick going into a building, fire brick entering into the construction of a steel furnace and all such material, which become an integral and material part of a manufactured product are far beyond and without the character of the products here. Fuel is used once. The material going into a product

or a structure is used once, but these rolls and boxes were employed again and again. They had a recognized period of useful existence, comparatively short, obviously, because of the environment in which they operated. But they were a part of the tools of the steel maker in the making of his product and a part of his equipment in its annealing. Their relatively short period of useful life was due to their vital impairment and deterioration arising from their continued employment as means, appliances, tools and equipment in achieving an end,—manufacture of steel products. They were in no wise blended into a new thing but retained their separate identities throughout their useful existence.

Much is said concerning the meaning of the word "immediate," plaintiff insisting that its connotation, as used in the statute, is that of immediate in causation rather than immediate in time. In view of our conclusion on the facts, we deem it unnecessary to attempt to define the legislative term. It should be observed, however, that the word "immediate" is used in ordinary language as a relative and comparative term. In historical epochs a recovery immediately following a depression may mean something which in another situation would be far from immediate. An immediate result may follow instantaneously in an explosion of dynamite. It may follow a flood within twenty-four hours at the lower end of a stream arising in a far off mountain. The word must be construed always with the particular facts and circumstances involved in mind.

In this connection, it is well to observe that the only Indiana decision bearing upon this statute is that of the Circuit Court of Marion County, Indiana, wherein the court held that fire brick placed in a steel furnace were property within the statutory definition of wholesale sales and taxable at one-fourth of one per cent. Obviously the property was of character different from that involved here, as it was not a tool or an appliance used in a manufacturing process but became an integral part of a structure. The pertinent portion of the opinion has to do with the court's discussion of the word "immediately," as follows:

"The 1937 amendments say, in effect, that the property must be immediately consumed in direct production. Obviously, this cannot mean consumption without lapse of time. The burning of coal re-

quires a time interval; the consumption or using up of lubricating oil requires a much longer period of time; yet both are considered by the Division to be 'immediately consumed' within the meaning of the Act."

We have followed this principle in our application of the statute.

The judgment is affirmed.