**DEPARTMENT OF REVENUE, State of Indiana, and Gross Income Tax Division of the State of Indiana, Appellant-Defendant,**

v.

**UNITED STATES STEEL CORPORA-TION, Appellee-Plaintiff.**

No. 3–980A285.

Court of Appeals of Indiana,
Fourth District.

Sept. 15, 1981.
Rehearing Denied Oct. 9, 1981.

Linley E. Pearson, Atty. Gen., Ted J. Holaday, Deputy Atty. Gen., Indianapolis, for appellant-defendant.

Wendell C. Hamacher and David M. Hamacher, Hamacher & Hamacher, Crown Point, William F. Fullagar, Rooks, Pitts, Fullagar & Poust, Chicago, for appellee-plaintiff.

CHIPMAN, Presiding Judge.

The Indiana Department of State Revenue (Department) appeals the decision of the Lake Circuit Court ordering a refund of use tax paid by United States Steel Corporation on the purchase of personal protective equipment at the Gary Works.

The Department contends the equipment does not qualify for the manufacturing exemption of Ind.Code 6–2–1–39(b)(6) or Ind. Code 6–2–1–39(b)(10)[1] because the equipment was not directly used or consumed by United States Steel in the direct production of steel.

The trial court found the exemption did apply and we affirm.

The Department raises several issues for our consideration, which we restate as follows:

1. Was it contrary to the facts and the law to find U.S. Steel's safety equipment directly used or consumed in direct production of tangible personal property?

2. Was it contrary to the facts and the law to find the Department's regulations and circulars vague, inconsistent, misleading and unsupported by the statute?

3. Was it proper to allow the admission of 1964 and 1965 Department circulars as evidence to show the scope of the exemption?

4. Did the trial court err as a matter of law in awarding 8 percent interest on the tax refund retroactive to the time of U.S. Steel's tax payment in 1974, when the statutory rate before 1978 was 6 percent?

I.

The tax exemption statute in this case is an old acquaintance of the Court of Ap-

---

1. Ind.Code 6–2–1–39 Exemptions.—
   "(b) Nor shall the state gross retail tax apply to any of the following transactions:
   (6) Sales of manufacturing machinery, tools and equipment to be directly used by the purchaser in the direct production, manufacture, fabrication, assembly, extraction, mining, processing, refining or finishing of tangible personal property; sales of agricultural machinery, tools and equipment to be directly used by the purchaser in the direct production, extraction, harvesting or processing of agricultural commodities; and sales of tangible personal property to be directly used by the purchaser in the direct production or manufacture of any such manufacturing or agricultural machinery, tools and equipment.
   (10) Sales of any tangible personal property as a material which is to be directly consumed in direct production by the purchaser in the business of producing tangible personal property by manufacturing, processing, refining, repairing, mining, agriculture, horticulture, floriculture, or arboriculture."

peals. We have considered its application to purchases of air conditioning equipment, trucks, pumps, sponges, bird repellant, ice, milk cans and more. Qualification of an item for exemption consistently has depended on its use in a specific context. For instance, refrigeration equipment for a dairy was exempt in *Indiana Department of State Revenue v. American Dairy of Evansville, Inc.*, (1975) 167 Ind.App. 367, 338 N.E.2d 698, but environmental control equipment for a television tube manufacturer was not in *Indiana Department of State Revenue v. RCA Corp.*, (1974) 160 Ind.App. 55, 310 N.E.2d 96.

The key provision requires manufacturing equipment be *directly* used or consumed by the purchaser in *direct* production of tangible personal property. The trial court in this case concluded this so-called "double direct" standard was satisfied but also found the Department's interpretation of the standard was unconstitutionally vague, inconsistent and unsupported by the statute.

Among the trial court's specific findings of fact were the following:

"That the Taxpayer is a basic steel producer and its production workers, while engaged in an integrated series of operations for the production of steel which begins with the Coke Ovens and extends through the Blast Furnace, Open Hearth or BOP Shop, Primary Mills or Continuous Caster, Blooming Mill, Sheet Mill, Scarfing, and other steps necessary to produce a product for sale, wear specially designed equipment, personal protective equipment, to allow them to operate the machinery and tools used in the production of the Taxpayer's products.

The personal protective equipment consists of prescription safety eyeglasses, protective mittens, hardhats, goggles, masks, hoods, heat shields, respirators and protective gloves, trousers, jackets and aprons, as well as aluminized asbestos long coats, green long coats, chaps and leggins, which are furnished to Taxpayer by its suppliers, in conformance with Taxpayer's design and specifications.

Although the personal protective equipment in issue is vital to the participation of production workers in the production steps, it is also designed for and used by production workers to perform many production tasks, which they could not otherwise perform. These tasks are not only necessary in order to make steel but also have a positive effect on the product.

The purpose of personal protective equipment is to make production of steel possible. The temperature control of the coke oven, the tapping of the open hearth, the pouring from the ladle into the tundish, the determination of the molten steel's readiness by use of cobalt glasses, standing in place, replacing nozzels, taking samples and withstanding splashes and spills, as well as scarfing, are made possible and are accomplished by use and application of the personal protective equipment.

Due to the tremendous temperatures involved in the steel making process, sometimes approaching 3000°, it is extremely clear that human beings could not participate in the production steps without the use of the personal protective equipment.

Production workers in personal protective equipment, including prescription safety eyeglasses, work on the production line within less than one (1) to three (3) feet of the production process during the various stages in the manufacture of steel.

The personal protective equipment purchased by Taxpayer and accounting coded for production is not sold or leased to others or used in areas other than production, but is only used by Taxpayer's production workers."

These facts are the principal supports for finding a direct link between the equipment and the production of steel. However the parties choose to frame the issues, the ultimate question centers on whether it is possible for safety equipment to become so entwined with production that it is subsumed by the production process. The trial

court's findings are essentially that the equipment passed beyond the mere function of protecting the worker to become an intimate part of production itself.

The evidence favorable to those findings indicates U.S. Steel established a tax accounting procedure whereby safety equipment was divided into two categories, one for equipment used by production employees while making steel and another for similar equipment not used in actual production or used by non-production employees, such as managers or visitors. Only the equipment in the first category—used by producers to produce steel—was claimed to be exempt. Employees wore this equipment so they could work within a deadly environment of temperatures rising to more than 1000 degrees fahrenheit and with an atmosphere of gaseous fumes, dirt and dust under intense light and noise. Without the equipment the workers would be quickly maimed or killed, and steel production would be impossible under the current state of technology.

The Department's contention is essentially that neither under these nor any other circumstances can safety equipment be directly used in direct production, and therefore the evidence here is insufficient as a matter of law and the trial court's conclusions are contrary to law. The Department relies primarily on our holding in *Indiana Department of State Revenue v. Harrison Steel Castings Co.*, (1980) Ind.App., 402 N.E.2d 1276.

As early as 1974, we held the language of the exemption statute to be ambiguous and accordingly construed the exemption narrowly. *Indiana Department of Revenue v. RCA Corp., supra.* In the cases since then, the court has continued to strictly construe the meaning of "direct production" and in so doing has evolved a test for directness which requires the equipment to have an immediate link with the product being produced.

■ U.S. Steel has asked us to abandon that approach, to find the statute's language unambiguous, and to read it more broadly than has been done before. We are

not inclined to speculate whether the statute was mistakenly found to be ambiguous in 1974. The court offered its interpretation then, and the legislature has not seen fit to modify it although there has been several opportunities to do so. When the court interprets a statute and the legislature fails to take action to change that interpretation, the legislature is presumed to have acquiesced in the court's interpretation, *Thomas v. Eads*, (1980) Ind.App., 400 N.E.2d 778. It is reasonable to assume the legislature would not intend an exemption to be construed broadly. *Indiana Department of State Revenue v. Boswell Oil Co.*, (1971) 148 Ind.App. 569, 268 N.E.2d 303. Moreover, we believe even a plain reading of the statute lends itself to the conclusion that "used in direct production" is a more confined concept than "used in the production process," which is the interpretation presented by the U.S. Steel brief. If the statute merely required the item to be "used in the production process," the word "direct" would be unnecessary. We may safely assume the legislature did not include the adjective "direct" as surplusage. *Engle v. City of Indianapolis*, (1972) 151 Ind.App. 344, 279 N.E.2d 827.

Manufacturing equipment may be either directly or indirectly used in production, and the legislature plainly intended to limit the exemption to those items directly a part of production. The ambiguity arises only in attempting to find where the line should be drawn. Our decisions hold the logical and practical distinction between directness and indirectness can be found where the equipment actually exercised some immediate effect on the product. *Indiana Department of State Revenue v. RCA Corp., supra* at 310 N.E.2d 100; *Indiana Department of State Revenue v. American Dairy of Evansville, supra* at 338 N.E.2d 701. We do not believe this strict construction has defeated the intention of the statute. *Department of Revenue Gross Income Tax Division v. Bethel Sanitarium, Inc.*, (1975) 165 Ind.App. 421, 332 N.E.2d 808.

Nevertheless, we are concerned that more recent decisions by the court which seem-

ingly require production equipment to have a "positive effect on" and a "casual relationship with" the product have restricted the exemption even further and have led to confusion and misunderstanding. The positive-effect/causal-relationship test of directness is a creature of the Department[2] and was urged upon this court as early as 1974 in the RCA case. *Indiana Department of State Revenue v. RCA Corp., supra* at 310 N.E.2d 98.

However, the court avoided adoption of the proffered regulatory language of "positive effect" and required there be merely an "immediate effect" on the product or the process of production. *Indiana Department of State Revenue v. RCA Corp., supra* at 310 N.E.2d 100.

"Whatever effect (whether positive or negative) that RCA's air conditioning or environmental control equipment may have on the tubes RCA manufactures, or on the process of their manufacture, (it) is exerted through the medium or agency of the environment (i. e. the air). The very name of the equipment, whether 'air conditioning' or 'environmental control,' signifies that its *immediate effect* is on the surroundings in which the manufacturing process takes place and only remotely, through the intervening agency of those surroundings, on the tubes or on the process by which they are manufactured." (emphasis added)

Likewise in *American Dairy*, the analysis adopted by the court was not whether the items had a positive or negative effect on the product but whether refrigeration equipment, for example, operated directly upon the dairy's products throughout production. The court found it did and was therefore distinguishable from the air conditioning in *RCA* where the immediate effect was on the environment, not on the product.

The court in *Department of Revenue v. Mumma Brothers Drilling Company*, (1977) 173 Ind.App. 487, 364 N.E.2d 167, analyzed the directness requirement again without relying on notions of positive effect and causation. The court noted a seller of agricultural water pumps could not claim a sales-tax exemption on a theory pumps were used in the production of food, but might claim the exemption on a theory they were used to extract water. While the pump's role was indirectly related to the

---

2. "45IAC2–3–20 Sale of tangible personal property used in the direct production of manufacturing or agricultural machinery, tools and equipment
(II) General Rule. Purchases of tangible personal property to be directly used by the purchaser in the direct production or manufacture of any manufacturing or agricultural machinery, tools, or equipment are exempt from tax, provided the machinery, tools, and equipment have a positive effect upon the article being produced or manufactured. In determining whether property is directly used, consideration must be given to the following factors:
(A) The physical proximity of the property in question to the production process in which it is used.
(B) The proximity of time of use of the property in question to the time of use of other property used before and after it in the production process; and
(C) The active causal relationship between use of the property in question and the production of a product."
"45IAC2–3–27 Sales of tangible personal property directly consumed in manufacturing, processing, refining or mining

(II) General Rule. Purchases of materials to be directly consumed in the production cycle or in mining are exempt from tax provided such materials have a positive effect upon the article being produced or mined. In determining whether property is directly consumed, consideration must be given to the following factors:
(A) The physical proximity of the property in question to the production process in which it is used;
(B) The proximity of time of use of the property in question to the time of use of other property used before and after it is in the production process; and
(C) The active causal relationship between use of the property in question and the production of a product.
(IV) Definitions. (A) Consumed as used in this regulation means the dissipation or expenditure by combustion, use or application, and does not mean or include the obsolescence, discarding, disuse, depreciation, damage, wear or breakage of tools, dies, equipment, machinery, or furnishings."

production of food, it was directly related to the production of water.

Only recently have our cases used the "positive effect" language of the Department's regulation in reaching a decision. In *Indiana Department of State Revenue v. Harrison Steel Castings, supra,* the court in a two-page opinion adopted the Department's test verbatim and somewhat hastily suggested *American Dairy* and *RCA* had followed this strict interpretation.

Shortly thereafter, the court in *Indiana Department of State Revenue v. Cave Stone, Inc.,* (1980) Ind.App., 409 N.E.2d 690, noted that transportation equipment which merely serves as a means for a product to go from one step to another does not have a positive effect on and causal relationship to the production of graded stone. By that, however, the court merely meant, as its holding indicates:

> " '[D]irectly used in direct processing' requires the transportation equipment be an integral part of a process which is ongoing during the transportation. Here the stone, while being transported, remains unaffected by processing."

*Indiana Department of State Revenue v. Cave Stone, Inc., supra* at 409 N.E.2d 696.

Consequently, to date, only *Harrison Steel Castings* unequivocally has adopted the Department's regulation as the proper approach for determining when the exemption applies. The briefs in that case indicate the safety equipment involved consisted of gloves and glasses to protect worker's eyes from flying debris and hands from rough castings. Although the court held the use of safety equipment in the production process was not a "direct" use because it did not have a positive effect on and active causal relationship to the product, the case provided no guidance into how that conclusion was reached using a test which we find riddled with ambiguity. Moreover, unlike the facts in *Harrison Steel Castings,* where the safety equipment was "for the protection of the workers, not the creation of the product," we now are confronted with safety equipment so highly specialized that creation of the product is impossible

without it. Consequently, we believe *Harrison* is factually distinguishable from the case presented by U.S. Steel and Harrison's adoption of the Department's positive effect test is inconsistent with the careful analysis of earlier decisions.

■ The focus of analysis should be whether the safety equipment is an integral part of manufacturing and operates directly on the product during production. While this remains a narrow interpretation of the statute, it is consistent with the obvious legislative purpose to encourage industrial growth by allowing an exemption for items closely connected with the production of goods. It is also consistent with our decisions in *RCA, American Dairy* and *Mumma Brothers.*

Unlike equipment designed to protect a worker from various injuries on the job or to provide a healthful job environment, U.S. Steel's safety equipment was one of the tools used by workers to accomplish the job. If U.S. Steel's heat-shielded human beings were replaced with heat-resistant robots, there would be little question but the exemption would apply. We see no reason to allow the question to turn on whether the equipment was animated by human beings or by electronics.

Since steel can be made only because shielded workers deal directly with the raw materials of the product, the shields not only protect the worker but are a part of manufacturing which operates directly on the product during production.

We hold the safety equipment in this case is not only essential and integral to the production of steel but was directly used by U.S. Steel in direct production. The trial court had sufficient evidence to find the equipment was so used and that finding is not contrary to law.

## II.

The trial court also found the safety equipment was directly consumed in direct production pursuant to Ind.Code 6–2–1–39(b)(10). According to U.S. Steel, the equipment was consumed because it wore

out rapidly, was often severely damaged and was not sold for use by a third party.

■ The ordinary meaning of the language of a statute should be presumed to be intended by the legislature unless it would manifestly defeat the object of the provisions. *U. S. v. Cleavenger,* (7th Cir., 1975) 517 F.2d 230. In defining "consumed" for income tax purposes, the legislature has provided:

"[T]he term 'consumed' as used herein shall refer only to the immediate dissipation or expenditure by combustion, use or application, and shall not mean or include, the obsolescence, discarding, disuse, depreciation, damage, wear, or breakage, of tools, dies, equipment, rolling stock or its accessories, machinery or furnishings."

Ind.Code 6–2–1–3(a)(7). Webster's Second New International Dictionary, 573 (1951) says consumed means:

"1. To destroy the substance of, esp. by fire;—Formerly and still figuratively used of any destructive or wasting process, as evaporation, decomposition or disease. 2. To spend wastefully; hence, to use up; expend; waste. 3. To use up (time) whether wastefully or usefully; as, hours consumed in reading. 4. To eat or drink up (food); devour. 5. To waste or burn away; to perish. Syn.—Absorb, spend, squander, dissipate."

The equipment used by U.S. Steel was subject to severe wear and tear, including burning. The record shows trousers and gloves worn by a scarfer would last about two weeks, aluminized equipment about 30 days, other clothing about three or four months and items used by a caster as long as six months.

U.S. Steel contends the test should not be the common one of dissipation but whether the equipment is withdrawn from the marketplace. That test appears in *Hertzler v. Manshum,* (1924) 228 Mich. 416, 200 N.W. 155, and is cited in *Gross Income Tax Department of Treasury v. Harbison-Walker Refractories Co.,* (1943) 113 Ind.App. 695, 48 N.E.2d 834. In *Harbison-Walker Refractories,* the court held: Because silica refractory material used to line open hearth furnaces was rendered useless for all other purposes when heated, and because it could not be removed or resold, it had been immediately dissipated despite its lingering usefulness as a furnace lining. In the same case, the court noted that in the case of consumer goods, dissipation would occur immediately when the goods reached the consumer and so were withdrawn from the market. It was not necessary for the goods to be destroyed to be consumed. However, when dealing with the consumption of manufacturing equipment, it is to torture the English language to force the concept of consumption into a meaning that equates it with normal wear and tear or withdrawal from the marketplace.

The safety equipment here was damaged, worn and depreciated like any other tool. Nothing in the record indicates to us it was consumed in direct production and such a finding by the trial court was in error, albeit harmless in light of our other holdings in this case.

### III.

■ The Department next contends the trial court erred in rejecting the Department's positive effect test.

To efficiently administer the statutory exemption the Department promulgated regulations and issued informal circulars to guide industry in its tax preparation. In 1972, the Department published a "positive effect" test for determining whether property was directly used and/or consumed. (See footnote 2, *supra.*) The test requires the equipment to have a "positive effect" upon the article being produced. "Positive effect" is not defined in the regulation, and it is a particularly troublesome phrase because it appears nowhere in the exemption statute nor can we find for it a basis in case law.

The term "positive" has so many uses it only adds to the ambiguity of the statutory requirement of "direct production." We have no reason to believe a "positive effect" on the product is any more direct than a "negative effect."

The Department's regulation further provides three factors which must be considered in determining whether property is directly used or consumed: 1) physical proximity, 2) temporal proximity, and 3) an active causal relationship. U.S. Steel contends, and we agree, those factors require the taxpayer to engage in so much guesswork it is virtually impossible to predict with any certainty how the Department will ultimately weigh the various factors. How close to what must the equipment be related in space and time to satisfy the Department's notion of proximity? What kind of causation is sufficient? Proximate cause? Immediate cause? Direct cause? What about multiple causation and intervening causes?

Moreover, the manner in which the regulation has been interpreted seems to us to go far beyond the meaning of the statute as interpreted in *RCA* and *American Dairy*. The air conditioning equipment in *RCA* failed to qualify because it did not have an immediate effect on the product or the manufacturing process, not because it had a negative effect on the television tubes or bore no causal relationship to the product. The concept of causation introduces an element into the equation which leads to a too narrow construction of the exemption statute. We find it is too vague and misleading to provide an effective and accurate guide for taxpayers.

### IV.

■ Much of the uncertainty and inconsistency interjected into this case stems from the vascilation of the Department in its attitude toward safety equipment.

Shortly after the passage of the exemption in 1963, the Department issued revised Circular ST 16, which included safety equipment as an exempt item.[3] Later versions of the same circular, beginning in 1967, failed to mention safety equipment and left industry to find from negative implication the Department's change of mind about the status of the equipment.

The Department contends those 1964 and 1965 circulars were irrelevant and should not have been introduced at trial. U.S. Steel maintains the circulars were relevant to show both legislative intent to include safety equipment and the inconsistent manner in which the Department has interpreted the statute.

The fact is, of course, any manufacturing equipment used directly by the purchaser in direct production is exempt, notwithstanding the Department's scepticism about safety equipment. It can not be *per se* excluded because the Department may have intentionally dropped it from a list of examples.

■ Moreover, the 1964–65 circulars were relevant to show the legislative intent of the exemption statute. Where a statute is considered by the court to be ambiguous, it is nevertheless necessary to attempt to effect the legislative intent. One of the aids to finding intent is the contemporaneous interpretation placed on the statute by the agency charged with administering the statute. *Indiana Department of State Revenue v. Colpaert Realty Corp.*, (1952) 231 Ind. 463, 109 N.E.2d 415. The exemption became effective in 1963. Less than four months later the Department issued its

3. "CIRCULAR ST–16 SUBJECT: DEFINITIONS OF TANGIBLE PERSONAL PROPERTY USED DIRECTLY IN DIRECT PRODUCTION, MANUFACTURE, FABRICATION, ASSEMBLY, PROCESSING, OR FINISHING OF TANGIBLE PERSONAL PROPERTY

This circular replaces Circular ST–16 dated January 2nd, 1964.

Examples of Articles Used in Direct Production:

(1) Actual production machinery which acts upon the raw material or components undergoing transformation into the completed product.

(2) Repair parts of production machinery, special tools to make such repairs, fuel and lubrication of production machinery and equipment.

(3) Equipment used to transport or handle work in process from one production step to another until the product is completed including packaging if required.

(4) Safety equipment used in direct production by employees, when such equipment is furnished without charge by the employer.

(5) Packages, materials used to make packages and machinery used in packaging."

opinion that safety equipment, when used in direct production by employees and when furnished without charge by the employer, is exempt. A year later, the Department again issued the same opinion. Those circulars apparently reflected the Department's belief about legislative intent at the time the statute was enacted and consequently were relevant to the most significant issue in this case—whether safety equipment can be within the scope of Ind.Code 6–2–1–39(b)(6) or (10)?

We find no error in the admission of the 1964 and 1965 circulars.

### V.

 The trial court awarded a tax refund with interest at 8 percent per year from March 11, 1974. The interest rate allowable on a tax refund is established by statute. The 8 percent rate became effective on January 1, 1978, and was raised again to 12 percent on January 1, 1981. Before 1978, the statutory interest rate was 6 percent. Consequently the Department contends U.S. Steel is entitled to 6 percent interest until December 31, 1977 and 8 percent until December 31, 1980 and 12 percent thereafter.

The Department offers no authority for its conclusion and argues only "such calculation is obviously what was intended when the legislature changed the rates, and to require interest to be calculated for the earlier years in which rates actually paid were much lower would be patently absurd." The Department draws our attention to Ind.Code 6–2–1–16 (repealed January 1, 1981), requiring interest rates of 8 percent on refunds, and to Ind.Code 6–8.1–9–2(c), requiring interest rates of 12 percent or as established by the tax commissioner pursuant to Ind.Code 6–8.1–10–1(c). Because those statutes do not provide for retroactive interest rates and no cogent argument nor authority has been offered to support the proposition, the issue has been waived. Ind.Rules of Procedure, Appellate Rule 8.3(A)(7).

### VI. CONCLUSION

We find the trial court had sufficient evidence to conclude as a trier of fact that safety equipment used by U.S. Steel was directly used in direct production of steel. Our opinion in *Harrison Steel Castings Company* does not *per se* exclude safety equipment in cases where the equipment is an integral part of manufacturing and operates directly on the raw materials of the product during production. Consequently the trial court's conclusion was not contrary to law and we affirm.

MILLER and YOUNG, JJ., concur.