**CHROME DEPOSIT CORPORATION, Petitioner,**

v.

**INDIANA DEPARTMENT OF STATE REVENUE, Respondent.**

Nos. 49T05–8908–TA–00033, 49T05–8908–TA–00034.

Tax Court of Indiana.

June 26, 1990.

Andrew K. Light, James H. Hanson, Scopelitis, Garvin, Light & Hanson, Indianapolis, for petitioner.

Linley E. Pearson, Atty. Gen. by Ted J. Holaday, Deputy Atty. Gen., Indianapolis, for respondent.

FISHER, Judge.

Chrome Deposit Corporation, an Indiana corporation, has filed its motion for summary judgment seeking a refund of corporation gross income taxes for the years 1982 and 1983, and sales and use taxes for

the years 1982, 1983, and 1984, which were paid to the Indiana Department of State Revenue. The Department does not dispute the lack of any genuine issue of material fact, but only disputes Chrome Deposit's conclusions.

### Facts

During the years in issue, Chrome Deposit was in the business of manufacturing a layered hard chromium metal that ranged in thickness from three ten-thousandths to ten ten-thousandths of an inch. The metal was applied to the surface of work rolls, which were large, heavy, iron rolls. These work rolls were used by steel and aluminum mills in rolling out sheets of steel and aluminum. Different types of work rolls controlled the type and thickness of steel or aluminum produced.

Chrome Deposit's basic function was to apply chromium metal to a work roll when the roll arrived at Chrome Deposit's facilities. The work roll was put into a tank and sprayed with steam to raise the temperature of the solid iron to a specified level, and this specified temperature was maintained constantly throughout the process. Next, the work roll was placed into a "scrub tank" and physically scrubbed with sponges, water, and a special cleansing material that removed surface impurities. The work roll was then lowered into a third tank where it was rinsed with clear water. After rinsing, the work roll was placed in a holding tank where it was cleaned, dried and maintained at a constant temperature until the hard chromium metal was applied.

The hard chromium metal was manufactured through the interaction of electricity with a chromic bath solution consisting of water, chrome, and various chemicals. A current was passed through copper bars and over to a tank that held the chromic bath solution. The work roll was lowered by a crane into the chromic bath solution where an electrical current was supplied by a connection made through copper connectors and a copper clamp assembly that held the work roll in the solution. The result was an extremely hard chromium metal that bonded to the work roll surface.

Upon use by Chrome Deposit's customers, the chromium metal lasts only about two to four hours in the rolling process because of the extreme heat and pressure that is used to press out the sheet steel and aluminum. The chromium metal is used continuously throughout the customer's rolling operation. A new hard chromium metal layer is required to be produced for each work roll used by Chrome Deposit's customers. Additional facts will be provided as necessary throughout the opinion.

### Discussion and Decision

Chrome Deposit contends that it is not providing repair or maintenance upon the work rolls by applying the chromium metal. Chrome Deposit maintains that it bonds a separate and identifiable product to work rolls that is used in the sheet steel and aluminum manufacturing process. Chrome Deposit states that the work rolls are functional in the mills without the chromium metal, but the efficiency of the sheet rolling process is greatly improved if the work rolls are utilized in conjunction with the chromium metal.

### A. Gross Income Tax

Chrome Deposit contests the Department's assessment of gross income tax on the following bases:

1. Chrome Deposit is engaged in wholesale sales under IC 6–2.1–2–1(c)(1)(B). Chrome Deposit sells tangible personal property—hard chromium metal—that is directly consumed in direct production by a purchaser in the business of producing sheet steel and aluminum by manufacturing, refining, and processing.

2. Alternatively, Chrome Deposit makes "wholesale sales" as defined by IC 6–2.1–2–1(c)(1)(D). In the event the Court finds that Chrome Deposit is not in the business of selling tangible personal property, it is certainly engaged in industrial processing or servicing as defined by that statute.

■ The Department contends that Chrome Deposit is subject to the higher income tax rate applicable to revenues gen-

erated by service activities as set forth in IC 6–2.1–2–3(b) and IC 6–2.1–2–5(9). The key issue is whether Chrome Deposit is engaged in wholesale sales or whether it provides a service. To authorize a collection of gross income tax, a transaction must come clearly within the relevant statutory provisions. In case of doubt, the statute will be construed against the state and in favor of the taxpayer. This rule applies even when the question presented is the correct rate of tax. *Indiana Dep't of State Revenue v. Klink* (1953), 232 Ind. 473, 112 N.E.2d 581.

Under IC 6–2.1–2–1(c)(1)(B), "wholesale sales" includes:

(B) Sales of tangible personal property which is to be directly consumed in direct production by a purchaser in the business of producing tangible personal property by manufacturing, processing, refining, repairing, mining, agriculture, or horticulture.

■ Thus, there are three elements of "wholesale sales" under this definition: (1) the taxpayer must sell tangible personal property; (2) the purchaser must directly consume the property in direct production; and, (3) the purchaser must be engaged in the business of producing tangible personal property by manufacturing, processing, or refining. Chrome Deposit asserts that it sells tangible personal property; that its customers directly consume the property in direct production; and that its customers are engaged in the business of producing tangible personal property by manufacturing, processing, or refining. Chrome Deposit's customers are mills, engaged in the manufacture of sheet steel and aluminum.

Chrome Deposit's first contention is that it sells tangible personal property in the form of its hard chromium metal. Therefore, Chrome Deposit concludes that the business activity from which it receives its income is the sale of the hard chromium metal for consumption in the sheet steel and aluminum producing process. According to Chrome Deposit, the application of the chromium to the work rolls is merely incidental to the actual sale. Chrome Deposit notes that the work rolls that come to

it are not broken or in need of repair. Therefore, Chrome Deposit contends that it does not service or repair the work rolls.

Chrome Deposit draws an analogy between its situation and the taxpayer's situation in *Indiana Department of State Revenue v. Klink*, 232 Ind. 473, 112 N.E.2d 581. In *Klink*, the taxpayer was engaged in selling soil limestone and marl to farmers. The taxpayer delivered the lime spread on the farmers' fields for no additional charge. The soil lime was sold for agricultural and horticultural use. The court found that "[t]he material sold was consumed in the direct production of tangible personal property by agriculture and horticulture." *Id.* at 475, 112 N.E.2d at 581. When the lime was spread upon the fields it became a part of the fields and immediately began the gradual expenditure of its corrective influence, greatly increasing the productivity of the soil. The court concluded:

The involved transactions were sales at wholesale. They do not have the characteristics of personal services or services of any character whatsoever.... Since no additional charge was made for delivering the lime spread upon the fields, no segregation of any part of the sum received from the sale is possible.

*Id.* at 478, 112 N.E.2d at 583.

Chrome Deposit persuasively argues that it is like the taxpayer in *Klink*, who applied fertilizer materials to its customers' lands. Chrome Deposit also places a product in a state of readiness to function, by applying its product to the work rolls. This incidental service of applying the product does not change the fact that Chrome Deposit is engaged in the business of making wholesale sales.

The Department relies on *Samper v. Indiana Department of State Revenue* (1952), 231 Ind. 26, 106 N.E.2d 797, for the proposition that the controlling factor for determining the taxable character of income is the source of the income, not the character of the business. The Department acknowledges that *Samper*, IC 6–2.1–2–7 and 45 I.A.C. 1–1–115 allow a taxpayer to segregate income if it comes from

sources that are taxable at different rates. However, if a taxpayer fails to separate such income on his books and records, it will be taxed at the highest applicable rate.

The Department also cites to *Samper* to establish the distinction between wholesale sales and services. In *Samper*, the taxpayer operated a radio repair operation. Even though the facts in *Samper* differ from the facts of the case at bar, the Department uses *Samper* to note the factors used by the court to distinguish between wholesale sales and services. Samper's customers did not merely purchase parts, but contracted for the restoration of an item to its useful state in consideration for a total sum to be paid. Samper furnished labor, parts, and service to restore the item. In holding that this was a service, the court noted that the restoration could not be completed by performing only labor or only furnishing the parts. *Id.* at 38, 106 N.E.2d at 803. The customer sought the knowledge and skill of the business to obtain the result the customer desired. The court found it was necessary to determine whether the services or the materials were incidental to the transaction. Which parts or materials were needed was entirely within Samper's discretion; therefore, Samper was providing a service. *Id.* at 49, 106 N.E.2d at 808.

The Department contends that *Klink*, 232 Ind. 473, 112 N.E.2d 581, does not support Chrome Deposit's case, since the lime was simply sold at a definite price per ton and there was no extra charge for spreading it on the fields. The Department contends that there are several aspects of Chrome Deposit's business that establish the fact that Chrome Deposit is engaged in providing a service. For example, Chrome Deposit's customers rely on the special knowledge and skill of Chrome Deposit to give them an appropriate chrome coating for their particular circumstances. The price charged depends on the size of the roll and any transportation provided. However, the price does not reflect the thickness of the chrome coating, nor is the price of the applied chrome separately stated on the invoices. Moreover, Chrome Deposit assumes responsibility for inspecting the rolls before they are plated and if a defective roll is plated they will not charge their customers. Chrome Deposit does not sell any chrome in a form other than that plated on the rollers. These facts, according to the Department, establish that Chrome Deposit is not in the business of selling its chrome metal. The Department concludes that Chrome Deposit's income is properly characterized as income derived from a service because the actual chrome metal furnished is merely incidental to the service provided to restore the rolls to a perfect condition for use in the mills.

Chrome Deposit responds that there is no question that it provides some services to its customers. In virtually every sales transaction, certain services are provided that are incidental to the sale. Chrome Deposit points out that the taxpayer in *Samper* sold materials to its customers who took their radios to the taxpayer for repair. Yet, the fact that the radio repairman was required to supply parts or materials necessary to restore the radios did not transform what was essentially a service transaction into a sales transaction. Similarly, the fact that the taxpayer in *Klink* transported and spread the fertilizer did not transform his sales transaction into a service operation.

Chrome Deposit interprets *Samper* and *Klink* as holding that the difference between a sales transaction and a service transaction is the intent of the parties. But for Samper's customer's intention to have his radio repaired (service), there would have been no sale of any incidental parts. Conversely, but for Klink's customer's desire to purchase fertilizer (sale), there would not have been any incidental services rendered in transporting and spreading the fertilizer.

The Court finds, despite the Department's reliance and emphasis, that the expertise of Chrome Deposit, the transportation provided and the prices charged by Chrome Deposit are not significant for purposes of determining the legal question presented in this case. These facts do not determine the character of the business. Unlike the customer in *Samper*, Chrome

Deposit's customers do not seek repair of their work rolls. The work rolls, in and of themselves, are completely functional in the mills without the concurrent use of Chrome Deposit's product. Rather, Chrome Deposit's customers' purpose is to purchase from Chrome Deposit a manufactured product, a chromium sleeve, that is attached to their work rolls which acts as a lubricant in the manufacturing of sheet steel and aluminum. But for its customers' desire to purchase the chromium sleeve, Chrome Deposit would not render the incidental services of attaching the sleeve to the work roll and transporting the work rolls on behalf of its customers.

Another case which Chrome Deposit finds analogous to its situation is *Gross Income Tax Department v. Harbison–Walker Refractories Co.* (1943), 113 Ind. App. 695, 48 N.E.2d 834. In that case, the taxpayer was engaged in the manufacture of a silica refractory material which was sold to steel manufacturers who used the material for lining open hearth furnaces devoted to the refining of steel. The life of the material was shortened by chemical and physical reactions as it was reduced to a molten condition due to extreme heat. Chrome Deposit's product is similarly exposed to extreme heat and physical pressure that causes its dissipation in the manufacturing process.

The Department maintains that the test used in *Harbison–Walker* was rejected in *Department of Revenue v. United States Steel* (1981) Ind.App., 425 N.E.2d 659. The court stated in *United States Steel*, "when dealing with the consumption of manufacturing equipment, it is to torture the English language to force the concept of consumption into a meaning that equates it with normal wear and tear or withdrawal from the marketplace." *Id.* at 665. However, the court in *United States Steel* rejected the *Harbison–Walker* test merely for the purpose of the factual distinction between the two cases. The court by no means overturned the *Harbison–Walker* decision. The *United States Steel* case involved wear and tear of certain safety equipment. The taxpayers argued unsuccessfully that safety gloves were used in the manufacturing process and that those gloves were consumed, instead of just simply worn out. *Id.* at 665. Between the two cases, *Harbison–Walker* is more factually similar to the case at bar. In *Harbison–Walker*, the bricks lasted for a short term and the refractory company was continuously selling them to the steel mills. The bricks crumbled from exposure to the heat and the remnants were simply washed away. Similarly, in the case at bar, the product is immediately used and consumed as opposed to simply breaking or wearing out or becoming obsolete.

The Department relies on *Ingram–Richardson Manufacturing Co. v. Department of Treasury* (7th Cir.1940), 114 F.2d 889, *rev'd on other grounds*, (1941), 313 U.S. 252, 61 S.Ct. 866, 85 L.Ed. 1313. Ingram–Richardson was in the business of fusing enamel with metal parts used in stoves and refrigerators manufactured by its customers. The metal parts were picked up at the customers's place of business and transported to Ingram–Richardson's factory. After the enameling process occurred, the metal parts were returned to the customer's business. Ingram–Richardson argued that its receipts were from "wholesale sales." However, the court concluded that Ingram–Richardson was providing a service.

The Department notes that both in Chrome Deposit's operation and in Ingram–Richardson's operation, the customer's property is picked-up, brought to the factory, additional material is added to that property and the same property is then returned to the customer by the plaintiff. In *Ingram–Richardson*, this business activity was held to be a service. 114 F.2d at 892.

Chrome Deposit argues that the functional use of its product distinguishes it from *Ingram–Richardson*. The taxpayer in that case relied upon a definition of wholesale sales, now found at IC 6–2.1–2–1(c)(1)(C). That section of the statute governs the sales of parts that make up a manufactured product. Thus, *Ingram–Richardson* did not address the same issue presented by the case at bar. Chrome De-

posit does not allege that its product becomes a part of the sheet steel and aluminum manufactured by its customers. Instead, Chrome Deposit relies on the definition of "wholesale sale" which governs the sales of products consumed in the manufacturing process. The taxpayer in *Ingram–Richardson* never argued that it manufactured a product for sale to its customer. Rather, it argued that it sold the materials used in connection with enameling because title to the stove and refrigerator parts, received from its customers, were sold back to the customers after it had enameled the parts. 114 F.2d at 892.

In *Oster v. Department of Treasury* (1941), 219 Ind. 313, 37 N.E.2d 528, cited to by the Department, the Indiana Supreme Court determined that a taxpayer who made ladies' coats was in the business of manufacturing, even though the bolts of cloth used by the taxpayer were furnished by his customer. The Court fails to find *Oster* persuasive for the Department's position of reliance. The court in *Oster* concluded that "it is not true that there can be no income from manufacturing without a sale." *Id.* at 318, 37 N.E.2d at 530. The taxpayer did not engage in sales, but his income was ascribed to the business of manufacturing. *Id.* The court held that the lower tax rate applies to wholesale operations, known as "wholesale sales," which includes operations which are not necessarily "sales." According to the *Oster* court, this is evidenced by the legislature's amendment to the statute, after the *Ingram–Richardson* decision, which added to the definition of "wholesale sales," "receipts received from the business of industrial processing, enameling, plating or servicing of any tangible personal property which is to be sold by the person for whom such processing, enameling, plating or servicing is done...." *Oster*, 219 Ind. at 320, 37 N.E.2d at 530. There is nothing in this decision which conflicts with the position taken by Chrome Deposit.

The Department asserts that Chrome Deposit still does not fall within the scope of IC 6–2.1–2–1(c)(1)(B) because its customers do not "consume" the chrome coating, as required by the statute. Under IC 6–2.1–2–1(a), "consumed" is defined:

(a) 'Consumed' means the immediate dissipation or expenditure by combustion, use, or application. However, the term consumed does not mean the obsolescence, discarding, disuse, depreciation, damage, wear, or breakage of tools, dies, equipment, rolling stock or its accessories, machinery, or furnishings.

Since the statute provides its own definition of the term, the Court is confined to a construction of the definition given as it concerns this case. *Harbison–Walker*, 113 Ind.App. at 699, 48 N.E.2d at 836.

The Department maintains that Chrome Deposit's product is subject to damage and wear, which is specifically excluded from the above definition of consumed. Chrome Deposit contends that its product does not wear out like a tool or a piece of equipment. Rather, Chrome Deposit's hard chromium sleeve begins and continues to wear away immediately upon application in the mill rolling process. It dissipates, and dissipation is included in the legislature's definition of "consumed."

The Department suggests that complete consumption is required and this is not the case with Chrome Deposit's product. After application, a small amount of residue may be left upon the work roll surface that comes in contact with the sheet steel and aluminum, and the portion of the work roll that does not make such contact still has part of the chromium sleeve affixed to it. The steel mills must grind the residue off before purchasing a new chromium sleeve.

Chrome Deposit contends that IC 6–2.1–2–1(a) does not require complete consumption. Chrome Deposit suggests that if that were the case then even sales of motor oil for consumption in manufacturing would not constitute "wholesale sales" unless the seller could demonstrate that absolutely no residue of oil remained in a machine after the oil's use.

Chrome Deposit asserts that the difference in the facts of *United States Steel*, 425 N.E.2d 659, and the facts before this Court illustrate the distinction between the wear and breakage of tools and the con-

sumption of its product. Safety equipment wears out as a collateral consequence of its use. Chrome Deposit's product wears away immediately and throughout its use. The following description of the dissipation process in *Harbison–Walker* is a comparable description of what happens to Chrome Deposit's product:

> Here *the process of dissipation is set in motion by the first step in the manufacturing process,* i.e., the first application of heat. *The evidence shows that after this first heat the material is rendered useless for all other purposes. It cannot be removed, nor can it be resold.* From thence forward its dissipation continues until it is useless for all purposes. *The whole process of manufacture is one continuous, entire, immediate act, embracing in its progress the destruction of the refractory material.* Its dissipation or expenditure is, therefore, immediate within the definition indicating causation.

113 Ind.App. at 701, 48 N.E.2d at 837 (emphasis added).

Likewise it is this "consumption" that distinguishes the case at bar from *Continental Roll & Steel Foundry Co. v. Department of Treasury* (7th Cir.1941), 117 F.2d 196. Here, the court addressed the issue of whether a manufacturer of work rolls, like the work rolls to which Chrome Deposit applies its product, is entitled to the lower tax rate for wholesale sales. The court concluded that the taxpayer was not entitled to the lower tax rate, because the property sold was not to be directly consumed in direct production of manufactured articles. The work rolls were used, worn, repaired, and then re-used, which meant that they were not "consumed." The court stated:

> [The rolls] are placed in housings and used again and again in the process of rolling steel ... until they lose their efficiency as factors in the manufacturing process. The tremendous temperatures and strain from pressure in operation soon produce a checking of the surface. The rolls are thereupon turned in lathes or redressed and again placed in use,

their life being limited to the number of times that this returning or redressing can be successfully done.

*Id.* at 197.

The *Continental Roll* court distinguished the wear and tear of the work rolls to the consumption or using up of lubricating oil, the latter recognized as being "immediately consumed," within the meaning of the statute. Chrome Deposit points out that unlike the work rolls, Chrome Deposit's product is not re-used. Chrome Deposit's product is something that is added to the work rolls and it is never reclaimed or re-used.

It should be noted that the court in *Continental Roll* found that the work rolls were not consumed because they never "entered into or became material or integral parts of any manufactured product." *Id.* at 198. This Court finds that, for purposes here, it is not necessary to construe so strictly the meaning of "directly consumed in direct production." *See Harbison–Walker,* 113 Ind.App. at 700–01, 48 N.E.2d at 836–37 (refractory material used in furnace was "directly consumed in direct production" even though it did not become a part of the refined steel).

Based on the foregoing, the Court finds that Chrome Deposit is engaged in the business of manufacturing a hard chromium metal which it sells to its customers. Chrome Deposit's customers do not pay it to bathe or rinse their work rolls, without the actual application of the chrome which is manufactured by Chrome Deposit. Chrome Deposit does not purchase the chromium metal elsewhere and then apply it; instead, they actually manufacture it. Without the material produced by Chrome Deposit there would be no services provided. This product is consumed by Chrome Deposit's customers in the process of creating their sheets of steel and aluminum. The chromium metal does not need to be integrated into the steel and aluminum, as the Department would suggest, in order to be consumed. The chromium sleeve dissipates much like the bricks in *Harbison–Walker.* Therefore, Chrome Deposit is entitled to the lower rate of income tax, as

provided by IC 6–2.1–2–1(c)(1)(B). Given this conclusion, the Court will not address Chrome Deposit's alternative argument regarding IC 6–2.1–2–1(c)(1)(D).

### B. Sales Tax

Chrome Deposit also disputes the Department's denial of sales tax exemptions on certain purchases. First of all, Chrome Deposit contends that it is entitled to a sales tax exemption on utility purchases, pursuant to IC 6–2.5–4–5(c).

The Indiana sales tax is only imposed upon "retail transactions." IC 6–2.5–2–1(a). However, IC 6–2.5–4–5(c) provides in pertinent part:

> [A] person engaged as a public utility is not a retail merchant making a retail transaction when:
>
> \* \* \* \* \* \*
>
> (3) the ... person sells the services listed in subsection (b) to a person for use in manufacturing, mining, production, refining, oil extraction, mineral extraction, irrigation, agriculture, or horticulture.

However, this exclusion for sales of the services and commodities only applies if those sales are separately metered for the excepted uses listed in this subsection, or if those sales are not separately metered but are predominately used by the purchaser for the excepted uses listed in this subsection.

■ Given this Court's finding concerning the income tax issue, it is undisputed that Chrome Deposit is engaged in manufacturing. The issue now becomes whether Chrome Deposit's utility services are predominantly used in manufacturing, production, or refining. The Department does not put forth any argument to oppose the conclusion that Chrome Deposit's utility services are predominantly used in manufacturing, other than its contention that Chrome Deposit is not a manufacturer. In a summary judgment motion, the burden is on the moving party to show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Pepkowski v. Life of Indiana Ins. Co.* (1988), Ind.App., 526 N.E.2d 1015, 1016, *rev'd on other grounds,* (1989), Ind., 535 N.E.2d 1164. The non-moving party may rest upon his pleadings until the moving party establishes no genuine factual issue exists. *Pepkowski,* 526 N.E.2d at 1016. At this point the burden shifts to the non-moving party whose response must set forth specific facts indicating an issue of material fact. *Popp v. Hardy* (1987), Ind.App., 508 N.E.2d 1282, 1284. If the non-moving party fails to meet his burden then summary judgment may be granted. *Pepkowski,* 526 N.E.2d at 1017.

■ The undisputed facts show that the hard chromium metal is produced by the reaction of electricity with chemicals contained in the chromium bath, and the vast majority of electricity purchased by Chrome Deposit is used for this purpose. Chrome Deposit's utility supplier estimates that approximately 91 percent of Chrome Deposit's total connected electricity load is used in the production of the product and that 86 percent of its total kilowatt hours are devoted to its production activities. Similarly, natural gas is used in Chrome Deposit's operations. Chrome Deposit estimates that on an annual basis Chrome Deposit's natural gas purchases are predominantly used 65 percent of the time in production.[1] The term "predominantly" means more than 50 percent. 45 I.A.C. 2.2–4–13(e).

The Department does not dispute any of the figures quoted above. Therefore, the Court finds that Chrome Deposit has established that it is entitled to the sales tax exemption on the utility purchases in question, as a matter of law.

---

1. Chrome Deposit's utility supplier estimated that *the total gas load is used for production* during the non-heating months. The utility supplier also estimated that, during the heating season, 25% to 36% of the gas consumption is similarly used. Given that the heating and non-heating season each comprise six-month periods, the average on an annual basis is 65% use in production. These figures do not account for the heating of Chrome Deposit's facilities, and the role which that plays, if any, in the manufacturing process.

██ Chrome Deposit also contends that it is entitled to a sales tax exemption on various other purchases under IC 6–2.5–5–3(b). That statute provides in pertinent part:

Transactions involving manufacturing machinery, tools, and equipment are exempt from the state gross retail tax if the person acquiring that property acquires it for his direct use in the direct production, manufacture, fabrication, assembly, extraction, mining, processing, refining, or finishing of other tangible personal property.

Chrome Deposit asserts that there are five categories of purchases which are essential to the integrated process by which Chrome Deposit manufactures its hard chromium metal.

First, profilometers and other testing instruments are used to measure the range and average surface texture of work rolls after they have been subjected to the hard chromium metal processing. Chrome Deposit must meet specific quality standards for which it needs these testing instruments.

The Department's regulation applicable to this situation, states:

Machinery, tools, and equipment used to test and inspect the product as part of the production process are exempt.

45 I.A.C. 2.2–5–8(i).

Similarly, rectifier parts are also exempt from sales tax. Chrome Deposit uses rectifiers to transform electric current down to levels suitable for interaction with the chromium bath in order to produce the hard chromium metal.

Chrome Deposit also claims sales tax exemptions for safety equipment and clothing. Chrome Deposit contends that these items are "required to allow a worker to participate in the production process without injury or to prevent contamination of the product during production." 45 I.A.C. 2.2–5–8(c), Example (2)(F). Chrome Deposit explains that the safety items are necessary to protect the workers from injury that can result from the use of hazardous chemicals and the use of electric current in conjunction with water.

Another category of purchases which Chrome Deposit maintains is exempt from sales tax is the equipment used in constructing the pits into which the work rolls are placed during the production process. Chrome Deposit's pits are not used for pre-production or post-production storage. The hard chromium metal must be manufactured below ground, so that the ten ton work rolls may be lowered into the materials essential to the production process. Therefore, the pit items are exempt under 45 I.A.C. 2.2–5–8(e)(3), which provides:

Storage facilities or containers for materials or items currently undergoing production during the production process are deemed temporary storage facilities and containers and are not subject to tax.

Finally, Chrome Deposit claims a sales tax exemption on purchases of equipment used in the cleansing process. Chrome Deposit must clean the work rolls completely prior to application of the hard chromium metal. These cleansing items are an essential and integral part of the integrated process by which the hard chromium metal is produced and applied to the work rolls.

Under IC 6–2.5–5–3, there are three requirements for the exemption: (1) the property has to be acquired for direct use in (2) the direct production, manufacture, fabrication, etc., of (3) other tangible personal property. Requirements (1) and (3) are not disputed by the Department. However, the Department again raises the issue of whether Chrome Deposit is engaged in wholesale sales or services. This court having already determined this issue, finds that Chrome Deposit's purchases in question were acquired for direct use in the direct manufacturing of other tangible personal property.

THEREFORE IT IS HEREBY ORDERED, ADJUDGED, and DECREED that summary judgment be entered in favor of Chrome Deposit Corporation and, accordingly, the Department is ORDERED to refund income tax, sales tax, and interest owing to Chrome Deposit Corporation.